**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| JEREMY WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20 C 50390 |
| | ) | |
| | ) | Honorable Iain D. Johnston |
| v. | ) | Honorable Magistrate Judge Margaret |
| | ) | J. Schneider |
| MICHAEL CONLEY, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

NOW COMES Defendants Jordan Black, Michael Conley, Kassandra Marinelli, Danny Marinez, Luke Papke, and Ben Schlosser, by and through their attorney KWAME RAOUL, Attorney General of the State of Illinois, and for their Answer to Plaintiff's Second Amended Complaint state the following:

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation, under color of law, of Plaintiff's rights as secured by the United States Constitution.

**ANSWER: Defendants admit that 42 U.S.C. § 1983 offers redress under color of law for rights secured by the United States Constitution, but Defendants deny that Plaintiff is entitled to any redress in this matter.**

2.      This Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1343.

**ANSWER: Defendant admits that the Court had jurisdiction over this matter.**

3.      Venue is proper pursuant to 28 U.S.C. § 1391 because the acts complained of

arose in the Northern District of Illinois. Plaintiff, as well as Defendants Black, Conley, Marinelli, Martinez, and Schlossler reside within the Northern District of Illinois. Upon information and belief, Defendants Porter, Love, Wheeler, and Emmons also reside within the Northern District of Illinois. Defendant Papke resides in Vermont.

**ANSWER: Defendants admit that venue is appropriate in the Northern District of Illinois as it pertains to Defendants Black, Conley, Marinelli, Martinez and Schlossler. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 3.**

## STATEMENT OF CLAIM

A. **Mental Health at DCC**

4. DCC is IDOC's largest medium security facility. According to IDOC, "A major focus of the [DCC's] mission is to provide a comprehensive mental health program to address the individual and group needs of the mentally ill. The center strives to provide a safe and secure environment where mentally ill and /or developmentally disabled offenders, who are in need of placement in a correctional psychiatric setting, will have the opportunity to participate in treatment and educational programs that will assist them in their ability to function productively, both within the correctional setting and in their communities upon release."[1]

**ANSWER: Admit.**

5. At all times relevant to this Second Amended Complaint, Plaintiff was housed in the "C Wing" of DCC's Special Treatment Center ("STC").

**ANSWER: Admit.**

6. The STC is a medium security center comprised of locked, single-occupancy

---

[1] "Dixon Correctional Center," https://www2.illinois.gov/idoc/facilities/Pages/dixoncorrectionalcenter.aspx (last accessed June 6, 2023).

cells that houses both mentally ill and developmentally disabled individuals in IDOC's custody. The STC is a standalone building at DCC that is colloquially referred to as the "X-House" because of the building's shape. The X-House is comprised of four wings—named A Wing, B Wing, C Wing, and D Wing—that meet at a common central foyer area. Many, if not all, cells in each wing had visibility into the foyer.

**ANSWER: Admit.**

7.    At any given time, one or more of the wings in X-House are designated as "segregation" wings. Inmates are placed in segregation as a disciplinary measure. Inmates in segregation receive less time outside of their cells, including reduced, or no, "yard time" (time spent outside in the prison yard), "dayroom" (time spent in a communal indoor space), and "group time" (time spent in group therapy sessions).

**ANSWER: Admit.**

8.    During all times relevant to this Second Amended Complaint, C-Wing, where Plaintiff resided, was designated as a segregation unit. Plaintiff was thus on segregation status.

**ANSWER: Admit.**

9.    Many inmates housed at DCC, including Plaintiff, are prescribed medications, including medications to manage and treat often serious mental health conditions.

**ANSWER: Admit.**

10.    DCC's nursing staff is responsible for distributing medications to DCC inmates pursuant to prescriptions written by and instructions provided by doctors and/or other prescribing medical professionals.

**ANSWER: Admit.**

11.    When delivering medications to inmates at DCC, nurses are escorted by one or

more correctional officers. Ordinarily, the nurse responsible for distributing medications to inmates housed in a specific unit are escorted by the "wing officer," which is the correctional officer assigned to supervise the particular unit. That officer is responsible for allowing the nurse to administer the required medication, including for opening the applicable door or opening in the cell so that the inmate can receive the mediation.

**ANSWER: Admit.**

### B.    Cell Extractions at DCC

12.        The process for forcibly removing an inmate from his cell is referred to as an "extraction."

**ANSWER: Admit.**

13.        Due to the physical and potentially harmful nature of an extraction, IDOC has detailed policies that COs must follow before and during any extraction.

**ANSWER: Admit.**

14.        Pursuant to those policies, an extraction should only occur if there is a need for the inmate to leave the cell and if the inmate is not cooperating and will not voluntarily leave his cell.

**ANSWER: Admit.**

15.        Per IDOC policy, records must be kept that document any time a de-escalation team or tactical team is activated, including but not necessarily limited to incident reports completed by all members of a de-escalation team or a tactical team.

**ANSWER: Admit.**

16.        Per IDOC policy, all cell extractions must be filmed and the film of the incident must be maintained by DCC administrators.

**ANSWER: Admit.**

17.     Further, prior to extracting an inmate from his cell, a "de-escalation team" that is entirely separate and distinct from the extraction team must be deployed to the inmate's cell and employ de-escalation techniques in an attempt to gain the inmate's cooperation.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17.**

18.     The de-escalation team must consist of three DCC correctional staff members. One of those individuals must be a correctional lieutenant and/or a correctional sergeant, whichever is on duty at the time. Another member of the de-escalation team must be a mental health professional. Members of a de-escalation team must be trained in de-escalation techniques.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18.**

19.     Only a correctional lieutenant or a correctional sergeant, whichever is on duty as a "shift commander," may order a cell extraction. And the shift commander may not order a cell extraction until the three-person de-escalation team has attempted unsuccessfully to gain the inmate's cooperation. The shift commander must also receive the approval from the warden or warden-on-duty at DCC before ordering a cell extraction.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 19.**

20.     The shift commander's cell extraction order activates what is referred to as the "tactical team."

**ANSWER: Admit.**

21.     The tactical team is comprised of six correctional officers. Its purpose is to perform cell extractions and to respond to emergencies. One of the six members of the tactical team is

designated as the "squad leader" or the "assistant tactical commander."

**ANSWER: Admit.**

22.     Upon arriving at an inmate's cell and prior to performing an extraction, the tactical team must provide three clear and direct orders to the inmate to cooperate. The tactical team may not perform the extraction until the inmate has refused these three orders.

**ANSWER: Admit.**

23.     The use of force, including but not limited to the use of chemical agents, may only be used if an inmate is not cooperative. The use of chemical agents is permitted only as a last resort and only when absolutely necessary to mitigate a risk to the health and/or safety of inmates or staff members. The use of pepper balls, specifically, may only be used during high-risk extractions, such as when the inmate attempts to escape from the cell.

**ANSWER: Deny.**

24.     Any tactical team member who operates or uses chemical agents, such as pepper spray or pepper balls, must also undergo additional training to achieve certification in the use of such chemical agents, in light of the dangerous and harmful nature of those measures.

**ANSWER: Admit.**

25.     As part of chemical agent training, tactical team members are further trained that in extreme situations that warrant the use of pepper spray or pepper balls they should first deploy pepper spray and pepper balls towards the corners, walls, floor, and/or ceiling of a cell in order to coerce the inmate to cooperate without direct impact. The tactical team may **not** aim pepper spray or pepper balls directly at the inmate's body until indirect contact has proven unsuccessful. The tactical team may never aim pepper spray or balls at an inmate's face, head, neck, spine, or genitals.

**ANSWER: Deny.**

26.     Following a cell extraction, the extracted inmate must be provided medical attention to treat any injuries sustained during, before, or after the extraction.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26.**

27.     Any medical examination or treatment should be conducted in a private setting outside the presence of other inmates.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 27.**

28.     Following a cell extraction during which pepper spray or pepper balls are deployed, the extracted inmate must also be allowed to clean the pepper spray or pepper ball residue from his face by using an eye wash station and from his body by using a shower.

**ANSWER: Deny.**

29.     Failure to allow an inmate to remove pepper spray or pepper ball residue from his face or body will likely result in prolonged pain and injury to the inmate.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 29.**

30.     Following a cell extraction, a search of the now-empty cell must be performed. Only if there is reason to suspect that the extracted inmate possesses contraband on his body that poses a threat to the inmate or someone else, the tactical team may perform a strip search of the extracted inmate.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 30.**

31.     In the rare instance a strip search is necessary, only a "visual strip search" may be

performed of an inmate who is cooperative. During a visual strip search, DCC staff does not touch the inmate. Instead, DCC staff instruct the inmate to remove his clothing and to make visible for visual inspection various parts and cavities of his body.

**ANSWER: Deny.**

32.        A "controlled strip search" is a far more invasive and potentially humiliating process. During a controlled strip search, the inmate remains cuffed at his hands and his feet while DCC staff remove his clothes, hold him shackled against a prison bed, and physically inspect his body with their hands, including the physical touching the inmate's genitals and spreading the inmate's buttocks while other tactical team members observe.

**ANSWER: Deny.**

33.        Any controlled strip search should be performed on a bed with a mattress so as to not injure the inmate being searched.

**ANSWER: Deny.**

34.        The tactical team may perform a controlled strip search only if an inmate has been and continues to be uncooperative and refuses to participate in a visual strip search. A controlled strip search is not permitted if there is no reason to suspect that the inmate is hiding contraband that poses a threat to the inmate or another person.

**ANSWER: Deny.**

35.        Any strip search of an inmate, whether visual or controlled, should be conducted in a private area out of the view of others.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 35.**

36.        No IDOC personnel may perform a strip search for the purpose of humiliating or

embarrassing an inmate.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18**

37.     A strip search should never be filmed.

**ANSWER: Admit.**

### C.   Denial of Medications & Excessive Force During Defendants' Manufactured Cell Extraction

38.     In January 2020, and for the entire duration of his incarceration at DCC, Plaintiff had various medical problems, including hypertension, intermittent explosive disorder, antisocial personality disorder, borderline personality disorder, and schizoaffective disorder.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 38.**

39.     In order to treat Plaintiff's various psychological diagnoses, doctors had prescribed for Plaintiff several psychotropic medications.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 39.**

40.     On or about January 23, 2020, Plaintiff was denied his psychotropic medications, which caused Plaintiff mental anguish.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 40.**

41.     Nurse Emmons was the nurse assigned to distribute medications to inmates, including Plaintiff, housed on the C-Wing of the X-House on January 23, 2020.  CO Porter was the wing officer supervising the C-Wing of the X-House on January 23, 2020.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations set forth in paragraph 41.**

42.     CO Porter refused to allow Nurse Emmons to deliver Plaintiff's medications to him as directed by the doctor(s) or other medical professional(s) who prescribed the medications to Plaintiff, and Nurse Emmons failed to intervene to provide Plaintiff with his prescribed psychotropic medications.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 42.**

43.     As the wing officer supervising the C-Wing of the X-House, CO Porter also denied Plaintiff the opportunity to take a shower on January 23, 2020 after already denying Plaintiff his medications, further exacerbating Plaintiff's already increasing mental anguish.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 43.**

44.     In the early evening of January 23, 2020, after Plaintiff requested that prison personnel provide him with his medications and an opportunity to shower, Plaintiff requested to complete and file a Prison Rape Elimination Act ("PREA") complaint regarding conduct unrelated to the allegations in this Second Amended Complaint.  CO Porter denied Plaintiff his right to complete and file that PREA complaint by falsely reporting to other DCC staff that Plaintiff possessed a container of feces—or a "shit bomb"—in his cell such that staff in charge of receiving PREA complaints, including an individual identified as R. Wrobleski, refused to approach Plaintiff's cell.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44.**

45.     Experiencing mental anguish due to the denial of his basic medical and physical

needs, Plaintiff began pacing in his cell.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 45.**

46.     CO Porter falsely reported to Sgt. Wheeler and Lt. Love that Plaintiff had a "shit bomb." CO Porter also reported to Sgt. Wheeler and Lt. Love that Plaintiff had obstructed the window to his cell. As a result of CO Porter's false report, Sgt. Wheeler and Lt. Love activated the tactical team—COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler—to extract Plaintiff from his cell (hereinafter, the "incident").

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 46.**

47.     Feeling the effects of being without his medication, and further agitated by CO Porter's refusal to allow him to shower obstruction of Plaintiff's effort to file his PREA complaint, Plaintiff became distressed and began pacing in his cell. For reasons Plaintiff did not understand, the tactical team arrived to extract Plaintiff from his cell.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 47.**

48.     Despite knowing that Plaintiff suffered from mental health issues, neither CO Porter, Sgt. Wheeler, Lt. Love, nor any other DCC staff member called a mental health professional to speak with Plaintiff.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 48.**

49.     At no time did a de-escalation team arrive to speak with Plaintiff and seek his cooperation.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 49.**

50.     When the tactical team arrived at Plaintiff's cell, Plaintiff, expecting the imminent onslaught of chemical agents that would be used against him, removed his shirt and fastened it over his nose and mouth to protect his respiratory system from any chemicals.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 50.**

51.     CO Black quickly began firing pepper balls at Plaintiff, launching in excess of 30 rounds. CO Black also repeatedly used excessive amounts of pepper spray, deploying it for several seconds each time into the small cell inhabited only by Plaintiff. CO Black depleted approximately 3 cans' worth of pepper spray during the incident.

**ANSWER: Deny.**

52.     Rather than aiming the pepper spray and balls towards the ceiling, floor, or walls of the cell in accord with his training, CO Black immediately and intentionally aimed the pepper spray and pepper balls directly at Plaintiff, purposefully hitting him in the face, torso, and genitals repeatedly.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 52.**

53.     Eventually, after approximately eight or nine minutes, Plaintiff approached the cell door and cooperated with Defendants by agreeing to allow Defendants to place him in restraints.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 53.**

54.     Upon Plaintiff's cooperation, Defendants cuffed Plaintiffs' hands through the cuff port in the cell door. Thereafter, Defendants opened the door, forced Plaintiff to the ground, and, while he was laying face down on the cement floor, Defendants knelt on Plaintiff's back, shackled his feet, and placed a spit/bite mask on Plaintiff's face, which, like much if his body, was orange due to saturation from the direct impact of pepper spray and pepper balls.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 54.**

55.     CO Martinez was the first to enter Plaintiff's cell during the cell extraction.

**ANSWER: Admit.**

56.     CO Martinez forcefully blocked Plaintiff with a shield and watched the incident.

**ANSWER: Deny.**

57.     CO Martinez took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**ANSWER: Deny.**

58.     CO Martinez conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Deny.**

59.     CO Black shot the Plaintiff excessively with pepper spray and pepper balls.

**ANSWER: Defendant Black admits to shooting Plaintiff with pepper spray and pepper balls. Defendant Black denies that the shooting was excessive.**

60.     CO Black gave orders to other defendants and managed them as they used excessive force to remove Plaintiff from his cell using pepper spray, pepper balls, and shackles.

**ANSWER: Deny.**

61.     CO Black took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**ANSWER: Deny.**

62.     CO Black conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Deny.**

63.     CO Conley, along with CO Schlossler, shackled and applied a spit/bite mask to Plaintiff after Plaintiff was shot with pepper spray and pepper balls.

**ANSWER: Admit.**

64.     CO Papke watched the incident on January 23, 2020 without intervening. CO Papke took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**ANSWER: Deny.**

65.     CO Papke conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Deny.**

66.     Defendants brought Plaintiff to be inspected by a nurse post-extraction.

**ANSWER: Admit.**

67.     Upon inspection, Plaintiff had bruising on his torso due to the pepper balls, and pepper spray residue on his face and body. Plaintiff reported he was experiencing immense burning pain and stinging, and Plaintiff explicitly requested water to wash off his genitals and stated that his genitals were in pain. Defendants did not provide him the opportunity to wash off his genitals at that time, or at any time thereafter.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 67.**

68.     CO Porter and Nurse Emmons refused to provide Plaintiff with his prescribed psychotropic medications, triggering his agitated state and a mental health episode.  CO Porter further contributed to Plaintiff's mental health episode by not allowing Plaintiff to take a shower and by refusing to allow Plaintiff to file a PREA complaint.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 68.**

69.     Contrary to CO Porter's report, Plaintiff never had a "shit bomb" and never threw feces at the officers.  If not for this false report, Plaintiff would not have experienced the cell extraction or the unlawful strip search.  Because he never had a "shit bomb," yet was forcibly extracted without the benefit of proper de-escalation, Plaintiff was wrongfully punished for conduct in which he did not engage.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 69.**

70.     It was CO Porter's false report that caused the other Defendants to extract Plaintiff from his cell using excessive force, which resulted in severe physical and psychological injuries to Plaintiff.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 70.**

71.     CO Porter watched the incident on January 23, 2020 without intervening.  CO Porter took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 71.**

72.     CO Porter conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Deny.**

73.     Lt. Love and Sgt. Wheeler activated the tactical team without first requiring the deployment of a de-escalation team.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 73.**

74.     No Defendant employed de-escalation techniques in an attempt to achieve Plaintiff's cooperation.

**ANSWER: Deny.**

75.     No Defendant called a mental health professional to attend to Plaintiff's obvious mental health episode.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 75.**

76.     Before and during the extraction, other inmates in cells surrounding Plaintiff's informed the tactical team—COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler—that Plaintiff did not receive his medication.  Despite these repeated warnings, no Defendant called any medical professional to deliver Plaintiff's medications to him.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 76.**

### D.  Unlawful Strip Search & Denial of Plaintiff's Access to Shower

77.     COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler took Plaintiff to the eyewash station so that he could remove some of the pepper spray residue from his face.  COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler then took Plaintiff to a cell.

**ANSWER: Admit.**

78.    Plaintiff requested access to a shower to clean the pepper spray residue from his body, as he was still experiencing burning pain. COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler denied Plaintiff the ability to wash his body, and Plaintiff endured several days of burning pain and intense discomfort because of the pepper spray residue that remained on his body.

**ANSWER: Defendants admit that Plaintiff was denied the ability to wash his body. Defendants deny all other allegations in paragraph 78.**

79.    As a result of Defendants' excessive use of pepper spray and pepper balls against him, Plaintiff suffered bruises, welts, burns, difficulty breathing, and severe pain, including but not limited to experiencing feelings that his body was "on fire" for several days.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 79.**

80.    After having the opportunity to wash only his face, Plaintiff informed COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler that he was injured and requested medical attention.

**ANSWER: Defendants admit that plaintiff had the opportunity to wash his face. Defendants lack knowledge or information sufficient to form a belief as to the truth of all other allegations set forth in paragraph 80 and demands strict proof thereof.**

81.    Nurse Emmons arrived but did not provide the medical attention requested.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 81.**

82.    Plaintiff informed COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler and Nurse Emmons that he was injured on his genitals, among other parts of his body. Plaintiff was instructed to remove his pants to show his genitals to Nurse Emmons, but Plaintiff did not

want to do so because Plaintiff was in the X-House foyer and was thus visible to many other inmates who were in their cells nearby.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 82.**

83.     Instead of moving Plaintiff to a more private location, Nurse Emmons, with the help of COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler, lifted Plaintiff's shirt, examined his back and torso, and announced that Plaintiff was uninjured.  Nurse Emmons and COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler then announced that Plaintiff was refusing medical attention, and Nurse Emmons stepped away.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph 83.**

84.     COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler then performed an unnecessary and degrading controlled strip search of Plaintiff in front of several prison personnel, including Nurse Emmons.

**ANSWER: Deny.**

85.     Defendant CO Marinelli filmed the cell extraction, nurse evaluation, and portions of the crisis assessment.  However, concealing Defendants' unlawful strip search, Defendant Marinelli intentionally did not film the strip search, instead turning the camera towards a wall for the entire duration.  As a result, CO Conley and CO Schlossler's harassing and humiliating strip search of Plaintiff was purposefully not captured on camera.

**ANSWER: Deny.**

86.     During the unjustified strip search, CO Conley remarked, "I got the bottom" and searched Plaintiff's anus by using his hands to spread Plaintiff's glutei maximi and glutei minimi.

**ANSWER: Deny.**

87.     Plaintiff understood these comments and the manner in which Defendants conducted and watched the unjustified strip search to have been for purposes of humiliating, embarrassing, and degrading Plaintiff and for the additional purpose of causing Plaintiff, who Plaintiffs knew suffered from multiple diagnosed psychological conditions, continued psychological harm.

**<u>ANSWER:</u> Deny.**

88.     CO Schlossler removed Plaintiff's clothing and performed the majority of the unjustified strip search.

**<u>ANSWER:</u> Deny.**

89.     CO Schlossler took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**<u>ANSWER:</u> Deny.**

90.     CO Schlossler conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**<u>ANSWER:</u> Deny.**

91.     CO Marinelli then watched and observed, without intervening, while CO Conley and CO Schlossler conducted the unjustified strip search of Plaintiff, including the wholly gratuitous search the search around his anus, and purposefully humiliated and degraded Plaintiff in front of her.

**<u>ANSWER:</u> Deny.**

92.     Following the extraction of Plaintiff from his cell, a search of the cell was performed.  Neither a "shit bomb" nor a weapon were found.

**<u>ANSWER:</u> Deny.**

### E. Ongoing Harassment and Lasting Harm

93.     In the weeks and months following the incident, CO Conley purposefully harassed and dehumanized Plaintiff regarding the unjustified strip search of Plaintiff's buttocks and anus. Among other things, CO Conley called Plaintiff, to his face, degrading names such as "Chocolate Honey Buns."

**ANSWER: Deny.**

94.     CO Conley took no action to stop or prevent the constitutional violations perpetrated on Plaintiff.

**ANSWER: Deny.**

95.     CO Conley conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Deny.**

96.     CO Marinelli also derided Plaintiff about the unjustified strip search in the months following the incident.

**ANSWER: Deny.**

97.     CO Marinelli took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**ANSWER: Deny.**

98.     CO Marinelli conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Deny.**

99.     Defendants did not permit Plaintiff, despite Plaintiff's request, to rinse or wash any

of the pepper spray off his body, and the pepper spray remained on his stomach, chest, legs, and genital areas for days following the incident.

**ANSWER: Defendants admit that Plaintiff was not permitted to rinse or wash off his body. Defendants lack knowledge or information to admit or deny the other allegations in paragraph 99.**

100.    Plaintiff suffered severe pain and discomfort as he stood in his cell under suicide watch for approximately 4-5 days; during which period the pepper spray deployed during the January 23, 2020 extraction was still on his body.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations set forth in paragraph 100.**

101.    Plaintiff endured severe pain when urinating, as pepper spray residue remained on and around his penis and urinary meatus. To this day, Plaintiff has scarring attributable to this harm.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 101 and demands strict proof thereof.**

102.    As a result of both the physical harm described above and the unjustified strip search, Plaintiff experienced mental trauma giving rise to suicidal ideation throughout the week following January 23, 2020 and has had similar experiences of suicidal ideation periodically thereafter.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 102 and demands strict proof thereof.**

103.    Plaintiff had not, prior to the January 23, 2020 cell extraction, experienced such severe suicidal ideation. To this day, he experiences ongoing psychological harm.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 103 and demands strict proof thereof.**

F. **Obstruction of Plaintiff's Right to Submit Grievances**

104.    Plaintiff made several efforts to grieve the issues raised in this Second Amended Complaint.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 104 and demands strict proof thereof.**

105.    Plaintiff wrote three grievances regarding the cell extraction incident and unlawful strip search: Grievance 1 was written on or about February 18, 2020; Grievance 2 No. 002843, was written on or about May 17, 2020; and Grievance 3 No. 002927, was written on or about May 20, 2020.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph.**

106.    When Plaintiff submitted Grievance 1 to a prison counselor, Plaintiff was in solitary confinement and was thus instructed that providing grievances to a counselor was the proper procedure while in solitary confinement. Plaintiff never received any follow-up regarding Grievance 1, and, based on information and belief, this grievance was lost, destroyed, misplaced, or otherwise ignored by Defendants and/or other IDOC personnel.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 106 and demands strict proof thereof.**

107.    Plaintiff submitted Grievance 2 directly to the Administrative Review Board.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph.**

108.    Plaintiff submitted Grievance 3 to the prison counselor.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph.**

109.     Plaintiff received a response from the Administrative Review Board on or about October 5, 2020, taking no action on his behalf and mistakenly citing his failure to file a timely grievance.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph.**

110.     Having filed three grievances, including one to the Administrative Review Board, which took no action, Plaintiff exhausted the administrative remedies available to him.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph.**

111.     On July 3, 2020, IDOC Internal Affairs Inspector Lieutenant Arthur Manzano concluded that the calculated use of force and cell extraction of Plaintiff on January 23, 2020, was "necessary," and Warden Sonja Nicklaus "concur[red]" with Lt. Manzano's findings on July 4, 2020.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph.**

<u>**COUNT I**</u>
**42 U.S.C. § 1983 – Excessive Force (Cell Extraction) in Violation of the Eighth Amendment**

112.     Plaintiff re-alleges each paragraph of this Second Amended Complaint as if fully stated herein.

**ANSWER: Defendants incorporate by reference their responses in each paragraph of this Second Amended Complaint as if fully stated herein.**

113.   In excessively and gratuitously deploying pepper spray and pepper balls to extract

Plaintiff from his cell, Defendants applied force maliciously for the purpose of causing harm.

**ANSWER: Deny.**

114.    Defendants applied force that was disproportionate to any need to maintain or restore order or discipline.

**ANSWER: Deny.**

115.    While using excessive force, Defendants recognized the unnecessary nature of the force applied.  For instance, Defendants significantly outnumbered Plaintiff and were heavily armed with weapons and protective gear.  Further Plaintiff did not have a weapon and did not threaten to harm Defendants.

**ANSWER: Deny.**

116.    Defendants made no effort to temper the severity of the force they applied in extracting Plaintiff from his cell.

**ANSWER: Deny.**

117.    Defendants had actual notice of Plaintiff's serious medical need for mental and physical health care following the January 23, 2020 cell extraction.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph and demand strict proof thereof.**

118.    Defendants intentionally delayed Plaintiff's access to care and the ability to wash himself, and knowingly and intentionally subjected Plaintiff to days of physical suffering and mental anguish directly caused by their failure to allow Plaintiff to clean the painful pepper spray and pepper ball residue off is bruised and battered body and receive medical attention following the cell extraction.

**ANSWER: Deny.**

119.    As a result of Defendants' use of excessive force in violation of Plaintiff's constitutional rights, Plaintiff suffered physical injuries to his head, torso, and genital areas, and experienced mental anguish.

**ANSWER: Deny.**

## COUNT II
### 42 U.S.C. § 1983 – Excessive Use of Force (Improper and Invasive Strip Search) and Cruel and Unusual Punishment in Violation of the Eighth Amendment

120.    Plaintiff re-alleges each paragraph of this Second Amended Complaint as if fully stated herein.

**ANSWER: Defendants incorporate by reference their responses in each paragraph of this Second Amended Complaint as if fully stated herein.**

121.    There was no valid penological justification for the January 23, 2020 controlled strip search, whereby Defendants subjected Plaintiff to humiliation, designed to intentionally demean, harass, and embarrass Plaintiff in front of several IDOC employees including a female, CO Marinelli, and subjected Plaintiff to ridicule in the weeks and months following the incident.

**ANSWER: Deny.**

122.    Plaintiff was still suffering the effects of Defendants' excessive deployment of pepper spray when he was unnecessarily strip searched.

**ANSWER: Deny.**

123.    By instituting and continuing the strip search described in fuller detail above, Defendants subjected Plaintiff to an unnecessary use of force and to cruel and unusual punishment in violation of the Eighth Amendment.

**ANSWER: Deny.**

124.    As a direct result of the express decisions of Defendants in charge of approving, documenting, and/or conducting this unnecessary and invasive controlled strip search, Plaintiff

was subjected to an unreasonable body search that included his buttocks and in and around his anus, which was demeaning, dehumanizing, and humiliating.

**ANSWER: Deny.**

125. Furthermore, Defendants had supervisory responsibility to terminate the strip search and/or use less invasive measures, but failed to do so.

**ANSWER: Deny.**

## COUNT III
### 42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need (Medication) in Violation of the Eighth Amendment

126. Plaintiff re-alleges each paragraph of this Second Amended Complaint as if fully stated herein.

**ANSWER: Defendants incorporate by reference their responses in each paragraph of this Second Amended Complaint as if fully stated herein.**

127. At all times relevant, Plaintiff had well-documented mental and physical needs for which prison medical personnel had prescribed psychotropic medication. Plaintiff relied on this medication to maintain his mental health and stability.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph and demand strict proof thereof.**

128. On January 23, 2020, Plaintiff notified one or more of the Defendants that he needed his medication. On information and belief, Defendants were deliberately indifferent to Plaintiff's medical need by refusing to convey Plaintiff's request for his medications to medical staff.

**ANSWER: Deny.**

129. The delay in receiving his medication caused Plaintiff to experience a mental health

episode.

**ANSWER: Defendants lack knowledge or information to admit or deny the allegations in this paragraph and demand strict proof thereof.**

130.     Defendants' deliberate indifference caused Plaintiff to suffer great mental anguish, physical and emotional pain and suffering, and other grievous injuries and damages.

**ANSWER: Deny.**

<u>**COUNT IV**</u>
**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need (Removal of Pepper Spray Residue) in Violation of the Eighth Amendment**

131.     Plaintiff re-alleges each paragraph of this Second Amended Complaint as if fully stated herein.

**ANSWER: Defendants incorporate by reference their responses in each paragraph of this Second Amended Complaint as if fully stated herein.**

132.     Defendants were deliberately indifferent to Plaintiff's medical need when Plaintiff stated that his genitals were burning and he required water to wash his genital area and the rest of his body of the excessive pepper spray Defendants deployed when extracting Plaintiff from his cell.

**ANSWER: Deny.**

133.     As a result of delaying Plaintiff's access to water to wash himself, Defendants caused Plaintiff to languish in severe burning pain to highly sensitive areas of his body for several days.

**ANSWER: Deny.**

134.     As a result of their failure to address Plaintiff's serious medical need both before and after the cell extraction, Defendants demonstrated they knew of and blatantly disregarded an

excessive risk to Plaintiff's safety.

**ANSWER: Deny.**

135.     Defendants' deliberate indifference caused Plaintiff to suffer great mental anguish,

physical and emotional pain and suffering, and other grievous injuries and damages.

**ANSWER: Deny.**

**COUNT V**

**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need (Trauma Caused by Strip Search) in Violation of the Eighth Amendment**

136.     Plaintiff re-alleges each paragraph of this Second Amended Complaint as if fully

stated herein.

**ANSWER: Defendants incorporate by reference their responses in each paragraph of this**

**Second Amended Complaint as if fully stated herein.**

137.     Defendants performed an invasive controlled strip search of Plaintiff for the

purpose of humiliating and embarrassing him without any penological reason for doing so.

**ANSWER: Deny.**

138.     Defendants knew or should have known that the strip search would cause

Plaintiff psychological pain and trauma.

**ANSWER: Deny.**

139.     Nevertheless, Defendants performed the unnecessary and unjustified strip search

in violation of Plaintiff's Eighth Amendment rights.

**ANSWER: Deny.**

140.     Further, knowing that Plaintiff was harmed and traumatized by the strip search,

Defendants continued to harass and tease Plaintiff in the days, weeks, and months following the

strip search as a way to further humiliate and embarrass him, in further violation of Plaintiff's

Eighth Amendment Rights.

**ANSWER: Deny.**

**COUNT VI**
**42 U.S.C. § 1983 – Failure to Intervene in Violation of the Eighth Amendment**

141.     Plaintiff re-alleges each paragraph of this Second Amended Complaint as if fully stated herein.

**ANSWER: Defendants incorporate by reference their responses in each paragraph of this Second Amended Complaint as if fully stated herein.**

142.     In the manner described above, during the constitutional violations described herein, each Defendant at certain times stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity and obligation to do so.

**ANSWER: Deny.**

143.     Defendants had several reasonable opportunities over a substantial period of time to prevent this harm but failed to do so.

**ANSWER: Deny.**

144.     Failing to intervene was objectively unreasonable.  Given their training and experience as IDOC employees and correctional officers, Defendants knew or should have known that Plaintiffs' constitutional rights were being violated by their co-Defendants, yet they said and did nothing to attempt to stop it.

**ANSWER: Deny.**

145.     As a result of Defendants' failure to intervene, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages.

**ANSWER: Deny.**

**COUNT VII**

**42 U.S.C. § 1983 – Conspiracy to Violate Plaintiff's Rights Under the Eighth Amendment**

146.    Plaintiff re-alleges each paragraph of this Second Amended Complaint as if fully stated herein.

**ANSWER: Defendants incorporate by reference their responses in each paragraph of this Second Amended Complaint as if fully stated herein.**

147.    Each Defendant worked with, coordinated with, and conspired with one or more other Defendant to, while acting under color of state law, violate Plaintiff's constitutional rights by, among other things, withholding his medication, using excessive force while performing an unnecessary cell extraction, and performing an unnecessary and invasive strip search.

**ANSWER: Deny.**

148.    Each Defendant participated in and performed acts in furtherance of the conspiracy.

**ANSWER: Deny.**

**DEMAND FOR JURY TRIAL**

149.    Plaintiff respectfully demands a trial by jury of all issues so triable.

**ANSWER: Defendants demand a trial by jury on all counts so triable.**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that:

(a)    Judgment be entered in favor of Plaintiff on all counts;

(b)    Judgment be entered requiring Defendants to pay Plaintiff's general and special damages in a sum to be ascertained at trial;

(c)    Judgment be entered requiring Defendants to pay Plaintiff punitive and exemplary damages in a sum to be ascertained;

(d)     Judgment be entered requiring Defendants to pay Plaintiff's costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 or any other applicable provision;

(e)     Judgment be entered permanently enjoining Defendants, their agents, employees, subordinates, and successors in office from continuing the acts complained of herein or any retaliatory acts; and

(f)     Judgment be entered awarding PLAINTIFF such other and further relief as the Court may deem just and proper.

**ANSWER:   Defendants deny that Plaintiff is entitled to the requested relief, or to any relief whatsoever.**

## GENERAL DENIAL

**Defendants expressly deny any allegation not specifically admitted.**

## AFFIRMATIVE DEFENSES

1.     At all times relevant herein, Defendant acted in good faith in the performance of his official duties and without violating Plaintiff's clearly established statutory or constitutional rights of which a reasonable person would have known. Defendant is therefore protected from suit by the doctrine of qualified immunity.

2.     To the extent Plaintiff has failed to adhere to the Illinois Department of Corrections grievance procedures, his claim should be barred for failure to exhaust his administrative remedies prior to the initiation of this cause of action, which serves as a bar to Plaintiff's claims under the Prison Litigation Reform Act (42 U.S.C. § 1997) and *Perez v. Wisconsin Dept. of Corrections*, 182 F. 3ed 532 (7th Cir. 1999).

Dated: January 12, 2024

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

By: /s/ Manasseh A Konadu
MANASSEH A KONADU
Assistant Attorney General
General Law Bureau
115 S LaSalle St., 28th Fl.
Chicago, Illinois 60631
(312) 405-9428
Manasseh.Konadu@ilag.gov

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 12, 2024, he electronically filed the foregoing document with the Clerk of the Court for the Northern District of Illinois by using the CM/ECF system. All participants in the case are registered CM/ECF users who will be served by the CM/ECF system.

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

By: */s/ Manasseh A Konadu*
MANASSEH A KONADU
Assistant Attorney General
General Law Bureau
115 S LaSalle St., 28th Fl.
Chicago, Illinois 60603
(312) 405-9428
Manasseh.Konadu@ilag.gov