IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Jeremy Washington,<br><br>        Plaintiff,<br><br>      v.<br><br>Michael Conley, *et al.*<br><br>        Defendants. | Case No.: 20-cv-50390<br><br>Judge Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

While incarcerated at Dixon Correctional Center in January 2020, Plaintiff Jeremy Washington suffered a severe mental health episode. He claims that IDOC employees triggered the episode by withholding his psychotropic medication and that—once it started—correctional officers escalated the episode by dousing him in pepper spray, kneeling on his back, and performing an unlawful strip search.

Shortly after the incident, Washington filed an initial Complaint alleging Eighth Amendment violations. Over the course of discovery, though, Washington identified four additional IDOC employees that he believes played a role in causing his injuries. So, four years after the incident, Washington filed a Second Amended Complaint, identifying as "Additional Defendants," Sergeant Christopher Wheeler, Correctional Officer Brent Porter, Lieutenant Colton Love, and Nurse Katherine Emmons. The "Additional Defendants" moved to dismiss the claims against them under the statute of limitations. For the reasons explained below, that motion is denied.

1

I.   Background

The Court takes the following allegations from the Complaint and accepts them as true for the purpose of deciding this Motion. In January 2020, Plaintiff Jeremy Washington was housed in the special treatment unit of Dixon Correctional Center, where he was being treated for several psychiatric disorders. Pl.'s Second Am. Compl. (Dkt. 109), at ¶¶ 19, 52. When he didn't receive medication as scheduled on January 23, 2020, Washington's condition rapidly deteriorated. *See id.* ¶¶ 57—59. By the early evening, he paced anxiously around his cell in "mental anguish." *Id.* ¶ 59.

Defendant Correctional Officer Brent Porter allegedly began dissuading IDOC employees from approaching Washington by claiming that Washington had a ball of feces in his cell, which he might lob at passersby. *Id.* ¶ 60. Upon hearing of what Porter called a "shit-bomb," Defendants Sergeant Christopher Wheeler and Lieutenant Colton Love activated the prison's tactical team: a group of six correctional officers responsible for safely removing inmates in crises. *Id.* Before the tactical team can use force, though, Dixon mandates several de-escalation measures, such as sending trained professionals to reason with the inmate and firing warning shots. *Id.* ¶¶ 31, 37, 39. When the tactical team arrived, Washington claims that, contrary to Dixon's policies, all bets were off. *Id.* ¶ 66. Ready, fire, aim.

For the next eight or nine minutes, six officers released three canisters of pepper spray and at least thirty pepper balls into Washington's cell—allegedly aimed at his face, torso, and genitals. *Id.* ¶¶ 65—67. When the barrage finally ended, just

2

as suddenly as it began, Washington claims they cuffed him at the hands and feet, forced him to the ground, knelt on his back, and placed him in a bite mask. *Id.* ¶ 68. Then, they moved him to the foyer of the Special Treatment Unit, where he was quickly and publicly evaluated by Defendant Nurse Emmons. *Id.* ¶ 96.

Washington told Nurse Emmons he was in severe pain and requested water to rinse off his genitals. *Id.* ¶ 81. But the correctional officers allegedly refused, instead, ordering Washington to publicly expose his penis. *Id.* ¶ 96. When Washington then refused, the officers briefly lifted his shirt, declared that he was uninjured, and announced that he had refused treatment. *Id.* ¶ 97. Officers then proceeded to strip search Washington in front of several prison personnel, including Nurse Emmons. *Id.* ¶ 98. They made dehumanizing comments during and after the strip search. *Id.* ¶¶ 100, 107.

Worse still, Washington wasn't allowed to shower for several days after the alleged incident. *Id.* at ¶ 92. So, for four or five days after, the pepper spray soaked into his skin, causing permanent scarring. *Id.* Washington also suffered suicidal ideation in the days after the incident, which continues periodically, even now. ¶¶ 115—16.

On these allegations, Washington filed a *pro se* complaint in October 2020, claiming that the Defendants' excessive use of force and deliberate indifference to his injuries violated the Eighth Amendment's prohibition on cruel and unusual punishment. *See generally* Compl. (Dkt. 7). The Court appointed counsel for Washington a few months later. Dkt. 52. And, in April 2022, counsel filed

3

Washington's First Amended Complaint, naming all members of the tactical team as defendants. *See generally* Am. Compl. (Dkt. 73).[1]

Missing from Washington's First Amended Complaint are Defendants Wheeler, Porter, Emmons, and Love. *Id.* Washington attributes these omissions only to the "Defendants' repeated evasion of their discovery obligations and three substitutions of defense counsel," without acknowledging his own role in the delays. Pl.'s Resp. to Defs.' Mot. to Dismiss (Dkt. 143), 1. Despite the Court appointing counsel in early 2022, Washington deposed the first of the six Initial Defendants in April 2023, and the last in December of the same year. *Id.* at 2—3.

Once deposed, the Initial Defendants alleged that Lieutenant Love and Sergeant Wheeler had activated the tactical team back in 2020, and that CO Porter allegedly instructed Nurse Emmons to withhold Washington's psychotropic medication. *Id.* Based on those discoveries, Washington served a second set of discovery requests in June 2023, seeking:

> all records or reports by any medical or mental health personnel relating to the cell extraction at the center of this litigation, the report or account of the Shift Commander who authorized the use of force against Plaintiff on January 23, 2020[2], the shift roster from X-House of the night of January 23, 2020, and any and all records or reports regarding any attempted de-escalation tactics used on Plaintiff during or after the cell extraction.
>
> *Id.* at 3.

---

[1] The "Initial Defendants" in this case are Michael Conley, Jordan Black, Kassandra Marinelli, Danny Martinez, and Benjamin Schlosser. These Defendants answered Washington's First Amended Complaint on January 11, 2024. Initial Defs.' Answer to Pl.'s Second. Am. Compl. (Dkt. 115).

He then obtained leave to file a Second Amended Complaint, filed in November 2024. Dkt. 107. In addition to naming the Additional Defendants for the first time, Washington's Second Amended Complaint brings three new claims: (1) conspiracy to violate his Eighth Amendment rights; (2) excessive use of force in conducting the January 23, 2020, strip search; and (3) deliberate indifference to his trauma following the strip search. *See generally* Dkt. 109.

## II. Analysis

As a threshold matter, Washington's Second Amended Complaint plausibly suggests that he suffered cruel and unusual punishment, caused or at least worsened, by each of the Additional Defendants. The Defendants' Motion to Dismiss makes the halfhearted argument that "Plaintiff has not stated a claim upon which relief may be granted against Defendants." Defs.' Mot. to Dismiss (Dkt. 139), 1. But that's wrong.

In addition to alleging that Nurse Emmons and CO Porter wrongfully withheld his psychotropic medication, Washington alleges that Sergeant Wheeler and Lieutenant Love recklessly dispatched the tactical team. *See generally* Dkt. 109. The Defendants' argument to the contrary is perfunctory, undeveloped, and unavailing. *See United States v. Berkowitz,* 927 F.2d 1376, 1383 (7th Cir. 1991) (perfunctory and undeveloped arguments are waived).

Aside from a single sentence contesting the sufficiency of Washington's Complaint, the Defendants' entire Motion to Dismiss turns on the statute of limitations. Ultimately, though, the statutory arguments are premature. The

5

statute of limitations is an affirmative defense, "not something the plaintiff must anticipate and negate in her pleading." *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 435 (2017); Fed. R. Civ. P. 8(c)(1).

Affirmative defenses typically require development of the factual record. That's true in this case, too. Based on the limited factual record available, the Court can't determine when the statutory period first started to accrue. So, the Defendants' Motion to Dismiss is premature. *See Xechem, Inc. v. Bristol–Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).").

As a matter of law, "[t]he federal common law rule on when a statute of limitations begins to run is that it is when the plaintiff *discovers*, or by exercise of *due diligence* would have discovered, that he has been *injured* and who *caused* the injury." *United States v. Duke*, 229 F.3d 627, 630 (7th Cir. 2000) (emphases in original). Both parties agree that the statutory period for § 1983 claims filed in Illinois is two years. Dkt. 139, at 1; Dkt. 143, at 4.[2]

The factual component is less clear. Washington alleges that he didn't know who caused his injuries until he deposed the Initial Defendants in April 2023. Dkt. 143, at 2—3. That leaves open two factual questions: (1) When did Washington

---

[2] The statute of limitations for Eighth Amendment cases brought under § 1983 is borrowed from state law, which in Illinois is two years. *E.g., Booker v. Ward*, 94 F.3d 1052, 1056 (7th Cir. 1996); *e.g., Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008).

6

discover the information that led him to allege the Additional Defendants contributed to his injuries? And, more importantly, (2) when would a reasonable plaintiff exercising due diligence have discovered the same information?

The first question is suitable for resolution at the motion to dismiss stage; Washington discovered the Additional Defendants in April 2023. The second is less clear. Under Illinois law, "[w]hen a complainant should have discovered an injury is a question of fact, but [a] court can determine when the limitations period began if the facts are undisputed and only one answer is reasonable." *Am. Fam. Mut. Ins. Co. v. Krop*, 2018 IL 122556, ¶ 21, 120 N.E.3d 982, 988; *see also Clark v. Robert W. Baird Co.*, 152 F. Supp. 2d 1040, 1045 (N.D. Ill. 2001) (applying Illinois law). Indiana and Wisconsin law are the same. *Nelson v. Sandoz Pharms. Corp.*, 288 F.3d 954, 956 (7th Cir. 2002) (applying Indiana law); *Garrors v. Medtronic, Inc.*, 77 F. Supp. 3d 809, 816 (E.D. Wis. 2015) (applying Wisconsin law).

The Additional Defendants argue that, under the circumstances, Washington ought to have identified them sooner. Defs.' Reply in Support of their Mot. to Dismiss (Dkt. 146), at 5. But in making that argument, both Parties present facts outside the pleadings and offer competing concepts of reasonableness. *Compare id.* ("Relying solely on Defendants to identify witness they may use is not diligent.") *with* Dkt. 143, at 6 ("[A] reasonable factfinder could certainly determine that Plaintiff acted

7

diligently in preparing his claim and was prevented from asserting his rights.").[3] The Parties urge the Court to make fact-dependent findings with nary a fact on the record.

Rather than referee this race to the bottom, the Court seeks alternative grounds to resolve the motion. If Washington's Complaint is entitled to proceed under either equitable estoppel or relation back, as he insists, the Court may sidestep the fact-dependent statutory question altogether. Dkt. 143, at 6, 8. To that end, the Court assumes without deciding that the statutory period has expired—but only for the limited purpose of determining whether the Complaint may proceed without defining the precise statutory period.

### a. Relation back

If the statute of limitations did expire before Washington filed his Second Amended Complaint, he argues that it nevertheless relates back to his initial Complaint under Federal Rule of Civil Procedure 15(c). *Id.* 7—8. What counts, when adding new parties through relation back, is that the party to be brought in has notice of the existence of the action. Fed. R. Civ. P. 15(c); *see Schiavone v. Fortune,* 477 U.S. 21, 21 (1986). But, as pleaded, it seems the Additional Defendants lacked knowledge of the initial action against the tactical team members.

Nothing in Washington's Complaint suggests that the Defendants knew or should've known they were intended parties to the initial lawsuit. Washington cites

---

[3] What a reasonable factfinder may conclude is irrelevant on a motion to dismiss. At this early stage in litigation, the Court accepts Washington's well-plead allegations as true and draws all reasonable inferences in his favor. *See Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 11 806, 809 (7th Cir. 2019).

one sentence from an Initial Defendant's declaration, where he testified that, after learning about the litigation, he spoke with the "individuals involved in the extraction itself." Wolf Decl. Ex. D, Black Tr. (Dkt. 104), at 28:23—29:5. But Washington never alleged that the Additional Defendants participated in his cell extraction, or that they used any force against him.

Even if the Additional Defendants knew the initial lawsuit *existed*, moreover, there's no reason to believe that they knew or should've known they were intended parties to that suit. Washington hasn't alleged any special relationship between the Initial and Additional Defendants from which the Court might infer the Additional Defendants should've known they were intended litigants, but for a mistake in filing. *See Paulk v. Dep't of Air Force, Chanute Air Force Base*, 830 F.2d 79, 81 (7th Cir. 1987).

Furthermore, Washington offers no explanation for his failure to depose the Initial Defendants promptly. *See Fleece v. Volvo Construction Equipment Korea, Ltd.*, 2012 U.S. Dist. LEXIS 6750 (N.D. Ill. Jan. 20, 2012) (collecting cases) ("Following *Krupski*, numerous lower courts have held that *Krupski* precludes relation back when a plaintiff made an affirmative choice not to discover the identity of the new defendant."). So, his Second Amended Complaint doesn't relate back to the initial Complaint from October 2020.

Having said that, Washington wasn't required to plead in anticipation of the statute of limitations affirmative defense. *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016); *Mosley v. Bd. of Educ.*, 434 F.3d 527, 533 (7th Cir.

9

2006). But, on this record, the Court can't find that the Second Amended Complaint relates back. So, this alternative basis to avoid the statute of limitations is currently unavailable on this record.

### b. Equitable estoppel

Similarly, the Court can't resolve the Motion using equitable principles. "Equitable estoppel suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing." *Singletary v. Continental Illinois Nat. Bank & Trust Co.*, 9 F.3d 1236, 1241 (7th Cir. 1993). But a plaintiff is only entitled to equitable estoppel when "some extraordinary circumstance" prevented him from timely filing. *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). It is not an appropriate remedy for, as the Court sees here, "a garden variety claim of excusable neglect." *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96, (1990).

In his argument for equitable estoppel, Washington notes that the Defendants once missed a filing deadline and thrice substituted counsel. Dkt. 143, at 3. These are standard delays of litigation, precisely the "garden variety claim of excusable neglect." *Irwin*, 498 U.S. at 96. And though Washington alleges that the Defendants repeatedly evaded discovery obligations, without more, the Court can't distinguish intentional misconduct—as Washington boldly alleges—from genuine disputes over the scope of production and the practical realities of multiple counsel substitutions. *See e.g.*, Dkt. 143, at 1.

In short, Washington seeks one sauce for the goose and another for the gander. Washington asks the Court to hold the Defendants perfectly accountable for filing deadlines and prompt discovery productions, despite being responsible himself for a significant share of delays. Washington offers no explanation for delaying the depositions over a year after obtaining counsel, scheduling depositions over an eight-month period, or failing to serve interrogatories that would've identified the Additional Defendants.

So, in its discretion, the Court declines to toll the statute of limitations for Washington's Second Amended Complaint. As counsel who practice in the Western Division of the Northern District of Illinois well know, this Court applies the goose and gander rule. *DR Distribs., Inc. v. 21 Century Smoking, Inc.*, No. 12 CV 50324, 2019 U.S. Dist. LEXIS 22404, at *8 (N.D. Ill. Feb. 12, 2009).

For now, at least, the Court declines the parties' invitation to judge Washington's due diligence from an extremely limited record. *See Del Korth v. Supervalu, Inc.,* 46 Fed. Appx. 846, 848 (7th Cir.2002) ("When the record does not make it clear when the statute of limitations began to run, a 12(b)(6) dismissal is premature."). Upon developing the factual record, it may turn out to be the case that, through the exercise of due diligence, Washington could and even *should* have identified the Additional Defendants sooner. As the Defendants note, the names of the Additional Defendants were discernable from the initial discovery production of December 2021. Dkt. 146, at 4. So, if it does turn out that the Defendants could've gained more information by serving interrogatories or quickly scheduling depositions,

11

as the Defendants suggest, they might reraise these arguments, properly styled as a motion for judgment on the pleadings.

### III. Conclusion

For the reasons stated above, the Additional Defendants' Motion to Dismiss [139] is denied.

Entered: November 14, 2024               By:_____
                                               Iain D. Johnston
                                               U.S. District Judge