IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Jeremy Washington, | |
| Plaintiff, | |
| | Case no. 3:20-cv-50390 |
| v. | The Honorable Iain D. Johnston |
| | The Honorable Michael F. Iasparro |
| Michael Conley, *et al.*, | |
| Defendants. | |

## ANSWER TO PLAINTIFF'S FOURTH AMENDED COMPLAINT

NOW COME Defendants, Correctional Officers Jordan Black ("CO Black"), Michael Conley ("CO Conley"), Kassandra Marinelli ("CO Marinelli"), Danny Martinez ("CO Martinez"), Luke Papke ("CO Papke"), and Benjamin Schlossler ("CO Schlossler"), CO Brent Porter ("CO Porter"), and Correctional Registered Nurse Katherine Emmons ("Nurse Emmons"), answer Plaintiff's Fourth Amended Complaint as follows by and through their attorney, Kwame Raoul, Attorney General of Illinois:

## INTRODUCTION

1.     Jeremy Washington is a former inmate at Dixon Correctional Center where he was housed in a segregation wing of a special treatment center for individuals with mental illness and/or developmental disabilities. While housed there, prison staff deliberately withheld from Mr. Washington his prescribed psychotropic medication, triggering an acute mental health episode. Deliberately indifferent to the mental health crisis Mr. Washington was experiencing as a result

1

of Defendants' own misconduct, Defendants intentionally continued to withhold Mr. Washington's medication, withheld access to any mental health professional, and failed to comply with the State's own policy requiring de-escalation. Instead, Defendants elected to escalate the situation, exacerbate Mr. Washington's condition, and expose him to substantial bodily and mental harm by undertaking an unnecessary and violent cell extraction whereby officers intentionally shot Mr. Washington in the face, abdomen, and genitals with pepper spray and pepper balls. Once removed from his cell, Defendants elected to harm and degrade Mr. Washington further by performing an invasive strip search in view of several prison staff members—including a female staff member. Mr. Washington was also denied the ability to shower the pepper residue off or his body for several days and was denied the medical attention that he requested. To this day, Mr. Washington still lives with the physical, mental, and emotional injuries sustained during this traumatic experience. The events described herein constitute cruel and unusual punishment and caused Mr. Washington damages for which all defendants are liable. Defendants are also liable for punitive and exemplary damages.

**ANSWER**: **Denied.**

## THE PARTIES

2.      Plaintiff is a resident of Illinois and citizen of the United States. He is currently in the custody of the Illinois Department of Corrections ("IDOC") at the Joliet Treatment Center, 2848 West McDonough, Joliet, IL 60436. At all times relevant to this Fourth Amended Complaint, Plaintiff was incarcerated in the

custody of IDOC at Dixon Correctional Center (the "DCC"), 2600 North Brinton Ave., Dixon, IL 61021.

**ANSWER: Admitted.**

3.     CO Black resides in the United States and was a correctional officer employed by IDOC, acting under color of state law in the discharge of his duties, and was responsible for the health, safety, and security of inmates in IDOC custody at DCC during all times relevant to this Fourth Amended Complaint.

**ANSWER: Admitted.**

4.     CO Conley resides in the United States and was a correctional officer employed by IDOC, acting under color of state law in the discharge of his duties, and was responsible for the health, safety, and security of inmates in IDOC custody at DCC during all times relevant to this Fourth Amended Complaint.

**ANSWER: Admitted.**

5.     CO Marinelli resides in the United States and was a correctional officer employed by IDOC, acting under color of state law in the discharge of her duties, and was responsible for the health, safety, and security of inmates in IDOC custody at DCC during all times relevant to this Fourth Amended Complaint.

**ANSWER: Admitted.**

6.     CO Martinez resides in the United States and was a correctional officer employed by IDOC, acting under color of state law in the discharge of his

duties, and was responsible for the health, safety, and security of inmates in IDOC custody at DCC during all times relevant to this Fourth Amended Complaint.

**ANSWER**: **Admitted.**

7. CO Papke resides in the United States and was a correctional officer employed by IDOC, acting under color of state law in the discharge of his duties, and was responsible for the health, safety, and security of inmates in IDOC custody at DCC during all times relevant to this Fourth Amended Complaint.

**ANSWER**: **Admitted.**

8. CO Schlossler resides in the United States and was a correctional officer employed by IDOC, acting under color of state law in the discharge of his duties, and was responsible for the health, safety, and security of inmates in IDOC custody at DCC during all times relevant to this Fourth Amended Complaint.

**ANSWER**: **Admitted.**

9. CO Porter resides in the United States and was a correctional officer employed by IDOC, acting under color of state law in the discharge of his duties, and was responsible for the health, safety, and security of inmates in IDOC custody at DCC during all times relevant to this Fourth Amended Complaint.

**ANSWER**: **Admitted.**

10. Nurse Emmons resides in the United States and was a correctional registered nurse employed by IDOC, acting under color of state law in the discharge

of her duties, and was responsible for the health, safety, and security of inmates in

IDOC custody at DCC during all times relevant to this Fourth Amended Complaint.

**ANSWER: Admitted.**

## JURISDICTION AND VENUE

11.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the

deprivation, under color of law, of Plaintiff's rights as secured by the United States

Constitution.

**ANSWER: Defendants admit this action is brought pursuant to section
1983, but deny that it is to redress any deprivation of Plaintiff's rights.**

12.     This Court has jurisdiction over the action pursuant to 28 U.S.C. §§

1331 and 1343.

**ANSWER: Admitted.**

13.     Venue is proper pursuant to 28 U.S.C. § 1391 because the acts

complained of arose in the Northern District of Illinois. Plaintiff, as well as

Defendants Black, Conley, Marinelli, Martinez, and Schlossler reside within the

Northern District of Illinois. Upon information and belief, Defendants Porter, and

Emmons also reside within the Northern District of Illinois. Defendant Papke

resides in Vermont.

**ANSWER: Defendants admit venue is proper.**

## NATURE OF THE CASE

14.     This is an action for monetary damages and other relief, pursuant to

42 U.S.C. § 1983.

**ANSWER: Admitted.**

15.     Plaintiff brings this action to obtain redress for Defendants'

misconduct, which included excessive force, the denial of medical care, and an

unlawful strip search, causing Plaintiff to sustain physical and psychological

injuries.

**ANSWER: Defendants admit Plaintiff purports to bring this action to**

**obtain damages, but deny the rest.**

## FACTUAL ALLEGATIONS

### A.     Mental Health at DCC

16.     DCC is IDOC's largest medium security facility. According to IDOC, "A

major focus of the [DCC's] mission is to provide a comprehensive mental health

program to address the individual and group needs of the mentally ill. The center

strives to provide a safe and secure environment where mentally ill and/or

developmentally disabled offenders, who are in need of placement in a correctional

psychiatric setting, will have the opportunity to participate in treatment and

educational programs that will assist them in their ability to function productively, both within the correctional setting and in their communities upon release."[1]

**ANSWER: Admitted.**

17.     At all times relevant to this Fourth Amended Complaint, Plaintiff was housed in the "C Wing" of DCC's Special Treatment Center ("STC").

**ANSWER: Defendants admit Plaintiff was housed in C-Wing until January 23, 2020, when he was extracted. Defendants deny he was housed in C-wing thereafter.**

18.     The STC is a medium security center comprised of locked, single-occupancy cells that houses both mentally ill and developmentally disabled individuals in IDOC's custody. The STC is a standalone building at DCC that is colloquially referred to as the "X-House" because of the building's shape. The X-House is comprised of four wings—named A Wing, B Wing, C Wing, and D Wing—that meet at a common central foyer area. Many, if not all, cells in each wing had visibility into the foyer.

---

[1] "Dixon Correctional Center,"

https://www2.illinois.gov/idoc/facilities/Pages/dixoncorrectionalcenter.aspx (last accessed June 6, 2023).

**ANSWER: Defendants admit the physical description of the STC, deny that it is medium security only, and deny that many or all of the cells "had visibility into the foyer."**

19. At any given time, one or more of the wings in X-House are designated as "segregation" wings. Inmates are placed in segregation as a disciplinary measure. Inmates in segregation receive less time outside of their cells, including reduced, or no, "yard time" (time spent outside in the prison yard), "dayroom" (time spent in a communal indoor space), and "group time" (time spent in group therapy sessions).

**ANSWER: Defendants admit the first sentence, and admit that one reason inmates can be placed in segregation is for disciplinary reasons, and deny that it is the only reason. Defendants admit the rest.**

20. During all times relevant to this Fourth Amended Complaint, C-Wing, where Plaintiff resided, was designated as a segregation unit. Plaintiff was thus on segregation status.

**ANSWER: Admitted.**

21. Many inmates housed at DCC, including Plaintiff, are prescribed medications, including medications to manage and treat often serious mental health conditions.

**ANSWER: Defendants admit that inmates and Plaintiff were prescribed medications but lack knowledge and information sufficient to form a belief**

**as to whether Plaintiff's conditions constitute "serious mental health conditions."**

22.     DCC's nursing staff is responsible for distributing medications to DCC inmates pursuant to prescriptions written by and instructions provided by doctors and/or other prescribing medical professionals.

**ANSWER: Admitted.**

23.     When delivering medications to inmates at DCC, nurses are escorted by one or more correctional officers. Ordinarily, the nurse responsible for distributing medications to inmates housed in a specific unit are escorted by the "wing officer," which is the correctional officer assigned to supervise the particular unit. That officer is responsible for allowing the nurse to administer the required medication, including for opening the applicable door or opening in the cell so that the inmate can receive the mediation.

**ANSWER: Admitted.**

**B.     Cell Extractions at DCC**

24.     The process for forcibly removing an inmate from his cell is referred to as an "extraction."

**ANSWER: Admitted.**

25.     Due to the physical and potentially harmful nature of an extraction, IDOC has detailed policies that COs must follow before and during any extraction.

**ANSWER**: Defendants admit that such policies exist and that their understanding is that the IDOC expects officers to follow them. Defendants deny that this policy language defines the constitutional standards applicable under the Eighth Amendment or any other law.

26.     Pursuant to those policies, an extraction should only occur if there is a need for the inmate to leave the cell and if the inmate is not cooperating and will not voluntarily leave his cell.

**ANSWER**: Admitted.

27.     Per IDOC policy, records must be kept that document any time a de-escalation team or tactical team is activated, including but not necessarily limited to incident reports completed by all members of a de-escalation team or a tactical team.

**ANSWER**: Admitted.

28.     Per IDOC policy, all cell extractions must be filmed and the film of the incident must be maintained by DCC administrators.

**ANSWER**: Admitted.

29.     Further, prior to extracting an inmate from his cell, a "de-escalation team" that is entirely separate and distinct from the extraction team must be deployed to the inmate's cell and employ de-escalation techniques in an attempt to gain the inmate's cooperation.

**ANSWER**: Defendants admit that, under IDOC policy, a De-Escalation Response Team (DRT) should be activated prior to a calculated cell extraction if time and circumstances permit. Defendants further admit that the DRT is distinct from the tactical team that performs the extraction and that its role includes attempting to gain inmate compliance through approved de-escalation techniques. Defendants deny that the deployment of a DRT is required in all cases, and deny any implication that failure to deploy such a team, standing alone, constitutes a constitutional violation. Defendants deny the remainder.

30.     The de-escalation team must consist of three DCC correctional staff members. One of those individuals must be a correctional lieutenant and/or a correctional sergeant, whichever is on duty at the time. Another member of the de-escalation team must be a mental health professional. Members of a de-escalation team must be trained in de-escalation techniques.

**ANSWER**: Defendants admit that De-Escalation Response Teams (DRTs) exist within IDOC and that, under IDOC policy, DRT members should receive training approved by the Office of Staff Development and Training in communication techniques intended to promote de-escalation and voluntary compliance. Defendants specifically deny that a mental health professional is a required — or even permitted — member of the de-escalation team. Defendants further deny that the team must consist of

**three members or include a correctional lieutenant or sergeant, and deny the remaining allegations.**

31.     Only a correctional lieutenant or a correctional sergeant, whichever is on duty as a "shift commander," may order a cell extraction. And the shift commander may not order a cell extraction until the three-person de-escalation team has attempted unsuccessfully to gain the inmate's cooperation. The shift commander must also receive the approval from the warden or warden-on-duty at DCC before ordering a cell extraction.

**ANSWER: Defendants deny that the written policy limits the authority to order a cell extraction solely to a correctional lieutenant or sergeant acting as a "shift commander," and further deny that the term "shift commander" is used in the policy. Rather, the policy refers to a "shift supervisor," a position typically held by a correctional major. Defendants further deny that a three-person de-escalation team is required prior to a cell extraction; under the written policy, de-escalation efforts are to be made by a two-person team, and only when time and circumstances permit. Defendants also deny that warden approval is an absolute prerequisite to ordering a cell extraction; while the policy requires the shift supervisor to seek approval from the warden or assistant warden, if such approval is not available, the shift supervisor or any higher-ranking official in the chain of command may authorize the extraction.**

32.     The shift commander's cell extraction order activates what is referred to as the "tactical team."

**ANSWER: Admitted.**

33.     The tactical team is comprised of six correctional officers. Its purpose is to perform cell extractions and to respond to emergencies. One of the six members of the tactical team is designated as the "squad leader" or the "assistant tactical commander."

**ANSWER: Admitted.**

34.     Upon arriving at an inmate's cell and prior to performing an extraction, the tactical team must provide three clear and direct orders to the inmate to cooperate. The tactical team may not perform the extraction until the inmate has refused these three orders.

**ANSWER: Defendants admit that IDOC written policy states that, upon arriving at an inmate's cell and prior to performing an extraction, the tactical team must provide three clear and direct orders to the inmate to cooperate, and that the extraction may not proceed until the inmate has refused those orders. Defendants deny any implication that failure to follow this policy, standing alone, constitutes a violation of the Eighth Amendment or gives rise to liability under 42 U.S.C. § 1983. Defendants otherwise deny the allegations.**

35.     The use of force, including but not limited to the use of chemical agents, may only be used if an inmate is not cooperative. The use of chemical agents is permitted only as a last resort and only when absolutely necessary to mitigate a risk to the health and/or safety of inmates or staff members. The use of pepper balls, specifically, may only be used during high-risk extractions, such as when the inmate attempts to escape from the cell.

**ANSWER: Denied.**

36.     Any tactical team member who operates or uses chemical agents, such as pepper spray or pepper balls, must also undergo additional training to achieve certification in the use of such chemical agents, in light of the dangerous and harmful nature of those measures.

**ANSWER: Admitted.**

37.     As part of chemical agent training, tactical team members are further trained that in extreme situations that warrant the use of pepper spray or pepper balls they should first deploy pepper spray and pepper balls towards the corners, walls, floor, and/or ceiling of a cell in order to coerce the inmate to cooperate without direct impact. The tactical team may not aim pepper spray or pepper balls directly at the inmate's body until indirect contact has proven unsuccessful. The tactical team may never aim pepper spray or balls at an inmate's face, head, neck, spine, or genitals.

**ANSWER: Denied.**

38.     Following a cell extraction, the extracted inmate must be provided medical attention to treat any injuries sustained during, before, or after the extraction.

**ANSWER: Defendants admit that a medical staff member is generally present to evaluate an inmate after an extraction and medical attention is available unless it is refused by the inmate, such as what happened in this case. Defendants deny the rest.**

39.     Any medical examination or treatment should be conducted in a private setting outside the presence of other inmates.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 and state that whether medical treatment occurs in a "private setting" depends on the specific circumstances, including security and medical needs at the time.**

40.     Following a cell extraction during which pepper spray or pepper balls are deployed, the extracted inmate must also be allowed to clean the pepper spray or pepper ball residue from his face by using an eye wash station and from his body by using a shower.

**ANSWER: Defendants admit that inmates are generally allowed to clean chemical agent residue following an extraction, but deny that complete and total decontamination is constitutionally required in all circumstances, and deny that such decontamination is allowed to be given**

to individuals in custody who were, in events immediately preceding such, noncompliant.

41.     Failure to allow an inmate to remove pepper spray or pepper ball residue from his face or body will likely result in prolonged pain and injury to the inmate.

**ANSWER: Defendants admit that pepper spray and pepper ball residue may cause temporary discomfort if not promptly removed. Defendants deny the remaining allegations in this paragraph to the extent they suggest that any constitutional violation occurred or that Defendants acted with deliberate indifference to Plaintiff's health or safety. Defendants further state that Plaintiff was taken to an eyewash station following the extraction to address pepper spray residue on his face.**

42.     Following a cell extraction, a search of the now-empty cell must be performed. Only if there is reason to suspect that the extracted inmate possesses contraband on his body that poses a threat to the inmate or someone else, the tactical team may perform a strip search of the extracted inmate.

**ANSWER: Defendants admit that the cell must be searched eventually after the individual is removed. Defendants deny that an unclothed search may only occur if an officer "suspects" that the inmate possesses contraband on their person that poses a threat to the inmate or someone else.**

43.     In the rare instance a strip search is necessary, only a "visual strip search" may be performed of an inmate who is cooperative. During a visual strip search, DCC staff does not touch the inmate. Instead, DCC staff instruct the inmate to remove his clothing and to make visible for visual inspection various parts and cavities of his body.

**ANSWER: Defendants deny that an unclothed search is necessary only in "rare instances" and deny that a "visual strip search" must be performed if an inmate is "cooperative." Defendants admit the rest.**

44.     A "controlled strip search" is a far more invasive and potentially humiliating process. During a controlled strip search, the inmate remains cuffed at his hands and his feet while DCC staff remove his clothes, hold him shackled against a prison bed, and physically inspect his body with their hands, including the physical touching the inmate's genitals and spreading the inmate's buttocks while other tactical team members observe.

**ANSWER: Defendants deny that a controlled unclothed search is "invasive and potentially humiliating." Defendants admit the rest.**

45.     Any controlled strip search should be performed on a bed with a mattress so as to not injure the inmate being searched.

**ANSWER: Denied.**

46.     The tactical team may perform a controlled strip search only if an inmate has been and continues to be uncooperative and refuses to participate in a

visual strip search. A controlled strip search is not permitted if there is no reason to suspect that the inmate is hiding contraband that poses a threat to the inmate or another person.

**ANSWER: Denied.**

47. Any strip search of an inmate, whether visual or controlled, should be conducted in a private area out of the view of others.

**ANSWER: Defendants admit that if privacy is available for an unclothed search, privacy should be utilized. Defendants deny the rest.**

48. No IDOC personnel may perform a strip search for the purpose of humiliating or embarrassing an inmate.

**ANSWER: Admitted.**

49. A strip search should never be filmed.

**ANSWER: Admitted.**

**C. Denial of Medications & Excessive Force During Defendants' Manufactured Cell Extraction**

50. In January 2020, and for the entire duration of his incarceration at DCC, Plaintiff had various medical problems, including hypertension, intermittent explosive disorder, antisocial personality disorder, borderline personality disorder, and schizoaffective disorder.

**ANSWER: Defendants lack knowledge and information sufficient to form a belief as to the truth of these allegations.**

51.     In order to treat Plaintiff's various psychological diagnoses, doctors had prescribed for Plaintiff several psychotropic medications.

**ANSWER: Defendants admit that Plaintiff was, at the time, receiving prescribed medications from a mental health professional. Defendants lack knowledge and information sufficient to form a belief as to the truth of their psychotropic properties.**

52.     On or about January 23, 2020, Plaintiff was denied his psychotropic medications, which caused Plaintiff mental anguish.

**ANSWER: Denied.**

53.     Nurse Emmons was the nurse assigned to distribute medications to inmates, including Plaintiff, housed on the C-Wing of the X-House on January 23, 2020. CO Porter was the wing officer supervising the C-Wing of the X-House on January 23, 2020.

**ANSWER: Admitted.**

54.     CO Porter refused to allow Nurse Emmons to deliver Plaintiff's medications to him as directed by the doctor(s) or other medical professional(s) who prescribed the medications to Plaintiff, and Nurse Emmons failed to intervene to provide Plaintiff with his prescribed psychotropic medications.

**ANSWER: Denied.**

55.     As the wing officer supervising the C-Wing of the X-House, CO Porter also denied Plaintiff the opportunity to take a shower on January 23, 2020 after already denying Plaintiff his medications, further exacerbating Plaintiff's already increasing mental anguish.

**ANSWER: Denied.**

56.     In the early evening of January 23, 2020, after Plaintiff requested that prison personnel provide him with his medications and an opportunity to shower, Plaintiff requested to complete and file a Prison Rape Elimination Act ("PREA") complaint regarding conduct unrelated to the allegations in this Fourth Amended Complaint. CO Porter denied Plaintiff his right to complete and file that PREA complaint by falsely reporting to other DCC staff that Plaintiff possessed a container of feces—or a "shit bomb"—in his cell such that staff in charge of receiving PREA complaints, including an individual identified as R. Wrobleski, refused to approach Plaintiff's cell.

**ANSWER: Defendants admit that Defendant Porter reported such facts to others, but deny that he was "falsely reporting" such, in the sense that he intentionally misrepresented facts to others. Defendants deny the rest.**

57.     Experiencing mental anguish due to the denial of his basic medical and physical needs, Plaintiff began pacing in his cell.

**ANSWER: Defendants admit Plaintiff was pacing in his cell. Defendants deny the rest.**

58.     CO Porter falsely reported that Plaintiff had a "shit bomb." CO Porter also reported that Plaintiff had obstructed the window to his cell. As a result of CO Porter's false report, tactical team—COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler—was activated to extract Plaintiff from his cell (hereinafter, the "incident").

**ANSWER: Defendants admit that Defendant Porter reported such facts to others, but deny that he was "falsely reporting" such, in the sense that he intentionally misrepresented facts to others. Defendants specifically deny that Porter's report about a covered/obstructed window was false. Defendants deny the rest.**

59.     Feeling the effects of being without his medication, and further agitated by CO Porter's refusal to allow him to shower obstruction of Plaintiff's effort to file his PREA complaint, Plaintiff became distressed and began pacing in his cell. For reasons Plaintiff did not understand, the tactical team arrived to extract Plaintiff from his cell.

**ANSWER: Defendants admit Plaintiff was pacing in his cell. Defendants deny the rest.**

60.     Despite knowing that Plaintiff suffered from mental health issues, neither CO Porter, nor any other DCC staff member called a mental health professional to speak with Plaintiff.

**ANSWER: Denied.**

21

61.    At no time did a de-escalation team arrive to speak with Plaintiff and seek his cooperation.

**ANSWER: Defendants lack knowledge and information sufficient to form a belief as to the truth of this allegation.**

62.    When the tactical team arrived at Plaintiff's cell, Plaintiff, expecting the imminent onslaught of chemical agents that would be used against him, removed his shirt and fastened it over his nose and mouth to protect his respiratory system from any chemicals.

**ANSWER: Admitted.**

63.    CO Black quickly began firing pepper balls at Plaintiff, launching in excess of 30 rounds. CO Black also repeatedly used excessive amounts of pepper spray, deploying it for several seconds each time into the small cell inhabited only by Plaintiff. CO Black depleted approximately three cans' worth of pepper spray during the incident.

**ANSWER: Defendants admit that, during the eight minute encounter, Officer Black fired pepperballs into the cell and used pepper spray at varying intervals after ordering Plaintiff to cuff up 26 times. Defendants specifically deny that three full cans worth of pepper spray were depleted, and deny the rest.**

64.    Rather than aiming the pepper spray and balls towards the ceiling, floor, or walls of the cell in accord with his training, CO Black immediately and

intentionally aimed the pepper spray and pepper balls directly at Plaintiff, purposefully hitting him in the face, torso, and genitals repeatedly.

**ANSWER: Denied.**

65. Eventually, after approximately eight or nine minutes, Plaintiff approached the cell door and cooperated with Defendants by agreeing to allow Defendants to place him in restraints.

**ANSWER: Admitted.**

66. Upon Plaintiff's cooperation, Defendants cuffed Plaintiffs' hands through the cuff port in the cell door. Thereafter, Defendants opened the door, forced Plaintiff to the ground, and, while he was laying face down on the cement floor, Defendants knelt on Plaintiff's back, shackled his feet, and placed a spit/bite mask on Plaintiff's face, which, like much if his body, was orange due to saturation from the direct impact of pepper spray and pepper balls.

**ANSWER: Defendants deny that Plaintiff was "forced" to the ground or that any officer "knelt on Plaintiff's back" in the manner implied by this paragraph, and deny that any force used was excessive or applied with any malicious or sadistic intent. Defendants admit the rest.**

67. CO Martinez was the first to enter Plaintiff's cell during the cell extraction.

**ANSWER: Denied.**

68.     CO Martinez forcefully blocked Plaintiff with a shield and watched the incident.

**ANSWER: Denied.**

69.     CO Martinez took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**ANSWER: Denied.**

70.     CO Martinez conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Denied.**

71.     CO Black shot the Plaintiff excessively with pepper spray and pepper balls.

**ANSWER: Denied.**

72.     CO Black gave orders to other defendants and managed them as they used excessive force to remove Plaintiff from his cell using pepper spray, pepper balls, and shackles.

**ANSWER: Denied.**

73.     CO Black took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**ANSWER: Denied.**

74. CO Black conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Denied.**

75. CO Conley, along with CO Schlossler, shackled and applied a spit/bite mask to Plaintiff after Plaintiff was shot with pepper spray and pepper balls.

**ANSWER: Denied.**

76. CO Papke watched the incident on January 23, 2020 without intervening. CO Papke took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**ANSWER: Denied.**

77. CO Papke conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Denied.**

78. Defendants brought Plaintiff to be inspected by a nurse post-extraction.

**ANSWER: Admitted.**

79. Upon inspection, Plaintiff had bruising on his torso due to the pepper balls, and pepper spray residue on his face and body. Plaintiff reported he was experiencing immense burning pain and stinging, and Plaintiff explicitly requested water to wash off his genitals and stated that his genitals were in pain. Defendants

did not provide him the opportunity to wash off his genitals at that time, or at any time thereafter.

**ANSWER: Denied.**

80.    CO Porter and Nurse Emmons refused to provide Plaintiff with his prescribed psychotropic medications, triggering his agitated state and a mental health episode. CO Porter further contributed to Plaintiff's mental health episode by not allowing Plaintiff to take a shower and by refusing to allow Plaintiff to file a PREA complaint.

**ANSWER: Denied.**

81.    Contrary to CO Porter's report, Plaintiff never had a "shit bomb" and never threw feces at the officers. If not for this false report, Plaintiff would not have experienced the cell extraction or the unlawful strip search. Because he never had a "shit bomb," yet was forcibly extracted without the benefit of proper de-escalation, Plaintiff was wrongfully punished for conduct in which he did not engage.

**ANSWER: Denied.**

82.    CO Porter watched the incident on January 23, 2020 without intervening. CO Porter took no action to stop or prevent the constitutional violations perpetrated against Plaintiff.

**ANSWER: Denied.**

83.     CO Porter conspired with the other Defendants to perpetrate the violations of Plaintiff's Constitutional rights and to cover up those violations.

**ANSWER: Denied.**

84.     No Defendant employed de-escalation techniques in an attempt to achieve Plaintiff's cooperation.

**ANSWER: Denied.**

85.     No Defendant called a mental health professional to attend to Plaintiff's obvious mental health episode.

**ANSWER: Denied.**

86.     Before and during the extraction, other inmates in cells surrounding Plaintiff's informed the tactical team—COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler—that Plaintiff did not receive his medication. Despite these repeated warnings, no Defendant called any medical professional to deliver Plaintiff's medications to him.

**ANSWER: Defendants admit that during the extraction, other inmates with serious mental illnesses or developmental disabilities were yelling and screaming statements about Plaintiff. Defendants deny the rest.**

### D.     Unlawful Strip Search & Denial of Plaintiff's Access to Shower

87.     COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler took Plaintiff to the eyewash station so that he could remove some of the pepper spray

residue from his face. COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler then took Plaintiff to a cell.

**ANSWER: Admitted.**

88.     Plaintiff requested access to a shower to clean the pepper spray residue from his body, as he was still experiencing burning pain. COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler denied Plaintiff the ability to wash his body, and Plaintiff endured several days of burning pain and intense discomfort because of the pepper spray residue that remained on his body.

**ANSWER: Denied.**

89.     As a result of Defendants' excessive use of pepper spray and pepper balls against him, Plaintiff suffered bruises, welts, burns, difficulty breathing, and severe pain, including but not limited to experiencing feelings that his body was "on fire" for several days.

**ANSWER: Denied.**

90.     After having the opportunity to wash only his face, Plaintiff informed COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler that he was injured and requested medical attention.

**ANSWER: Denied.**

91.     Nurse Emmons arrived but did not provide the medical attention requested.

**ANSWER:** Defendants admit Nurse Emmons arrived to assess Plaintiff. Defendants deny the rest.

92.     Plaintiff informed COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler and Nurse Emmons that he was injured on his genitals, among other parts of his body. Plaintiff was instructed to remove his pants to show his genitals to Nurse Emmons, but Plaintiff did not want to do so because Plaintiff was in the X-House foyer and was thus visible to many other inmates who were in their cells nearby.

**ANSWER:** Defendants admit that Plaintiff stated he was "hit" in his "dick and balls." Defendants admit Plaintiff did not want to lower his trousers, but not for the reasons alleged. Defendants deny the rest.

93.     Instead of moving Plaintiff to a more private location, Nurse Emmons, with the help of COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler, lifted Plaintiff's shirt, examined his back and torso, and announced that Plaintiff was uninjured. Nurse Emmons and COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler then announced that Plaintiff was refusing medical attention, and Nurse Emmons stepped away.

**ANSWER:** Defendants admit that Plaintiff was not moved to "a more private location" because Plaintiff said he was "good" and only needed some "water." Defendants admit that an examination of Plaintiff's back

and chest were performed, and admitted that they concluded Plaintiff did not want further medical attention. Defendants deny the rest.

94.     COs Black, Conley, Marinelli, Martinez, Papke, and Schlossler then performed an unnecessary and degrading controlled strip search of Plaintiff in front of several prison personnel, including Nurse Emmons.

**ANSWER: Defendants admit that a controlled strip search was performed. Defendants deny the rest.**

95.     Defendant CO Marinelli filmed the cell extraction, nurse evaluation, and portions of the crisis assessment. However, concealing Defendants' unlawful strip search, Defendant Marinelli intentionally did not film the strip search, instead turning the camera towards a wall for the entire duration. As a result, CO Conley and CO Schlossler's harassing and humiliating strip search of Plaintiff was purposefully not captured on camera.

**ANSWER: Defendants admit CO Marinelli video-recorded the cell extraction, nurse evaluation, and "portions" of the crisis assessment. Defendants deny that any Defendants deny that any "unlawful strip search" occurred, admit that Marinelli intentionally did not film the strip search, consistent with the very allegation in this pleading that strip searches should not be filmed (¶ 49). Defendants admit that the search was not directly, visually recorded. Defendants deny the rest.**

96. During the unjustified strip search, CO Conley remarked, "I got the bottom" and searched Plaintiff's anus by using his hands to spread Plaintiff's glutei maximi and glutei minimi.

**ANSWER: Defendants lack knowledge and information sufficient to form a belief as to the truth of whether Defendant Conley stated "I got the bottom." Defendants admit the rest.**

97. Plaintiff understood these comments and the manner in which Defendants conducted and watched the unjustified strip search to have been for purposes of humiliating, embarrassing, and degrading Plaintiff and for the additional purpose of causing Plaintiff, who Plaintiffs knew suffered from multiple diagnosed psychological conditions, continued psychological harm.

**ANSWER: Denied.**

98. Following the extraction of Plaintiff from his cell, a search of the cell was performed. Neither a "shit bomb" nor a weapon were found.

**ANSWER: Defendants admit that a shit bomb was not located. Defendants deny a weapon or other contraband was not found.**

### E. Ongoing Harassment and Lasting Harm

99. In the weeks and months following the incident, CO Conley purposefully harassed and dehumanized Plaintiff regarding the unjustified strip search of Plaintiff's buttocks and anus. Among other things, CO Conley called Plaintiff, to his face, degrading names such as "Chocolate Honey Buns."

**ANSWER: Denied.**

100.    Defendants did not permit Plaintiff, despite Plaintiff's request, to rinse or wash any of the pepper spray off his body, and the pepper spray remained on his stomach, chest, legs, and genital areas for days following the incident.

**ANSWER: Denied.**

101.    Plaintiff suffered severe pain and discomfort as he stood in his cell under suicide watch for approximately 4-5 days; during which period the pepper spray deployed during the January 23, 2020 extraction was still on his body.

**ANSWER: Denied.**

102.    Plaintiff endured severe pain when urinating, as pepper spray residue remained on and around his penis and urinary meatus. To this day, Plaintiff has scarring attributable to this harm.

**ANSWER: Denied.**

103.    As a result of the physical harm described above, Plaintiff experienced mental trauma giving rise to suicidal ideation throughout the week following January 23, 2020 and has had similar experiences of suicidal ideation periodically thereafter.

**ANSWER: Denied.**

104.    Plaintiff had not, prior to the January 23, 2020 cell extraction, experienced such severe suicidal ideation. To this day, he experiences ongoing psychological harm.

**ANSWER: Denied.**

F.       **Obstruction of Plaintiff's Right to Submit Grievances**

105.    Plaintiff made several efforts to grieve the issues raised in this Fourth Amended Complaint.

**ANSWER: Defendants admit Plaintiff wrote a grievance regarding these events, but deny the rest.**

106.    Plaintiff wrote three grievances regarding the cell extraction incident and unlawful strip search: Grievance 1 was written on or about February 18, 2020; Grievance 2 No. 002843, was written on or about May 17, 2020; and Grievance 3 No. 002927, was written on or about May 20, 2020.

**ANSWER: Defendants admit Plaintiff filled out a grievance form on or about May 17, 2020. Defendants lack knowledge and information sufficient to form a belief as to the truth of the rest of this allegation.**

107.    When Plaintiff submitted Grievance 1 to a prison counselor, Plaintiff was in solitary confinement and was thus instructed that providing grievances to a counselor was the proper procedure while in solitary confinement. Plaintiff never received any follow-up regarding Grievance 1, and, based on information and belief,

this grievance was lost, destroyed, misplaced, or otherwise ignored by Defendants and/or other IDOC personnel.

**ANSWER: Defendants lack knowledge and information sufficient to form a belief as to the truth of this allegation.**

108.    Plaintiff submitted Grievance 2 directly to the Administrative Review Board.

**ANSWER: Admitted.**

109.    Plaintiff submitted Grievance 3 to the prison counselor.

**ANSWER: Defendants lack knowledge and information sufficient to form a belief as to the truth of this allegation.**

110.    Plaintiff received a response from the Administrative Review Board on or about October 5, 2020, taking no action on his behalf and mistakenly citing his failure to file a timely grievance.

**ANSWER: Denied.**

111.    Having filed three grievances, including one to the Administrative Review Board, which took no action, Plaintiff exhausted the administrative remedies available to him.

**ANSWER: Defendants lack knowledge and information sufficient to form a belief as to the truth of this allegation.**

112.    On July 3, 2020, IDOC Internal Affairs Inspector Lieutenant Arthur Manzano concluded that the calculated use of force and cell extraction of Plaintiff on January 23, 2020, was "necessary," and Warden Sonja Nicklaus "concur[red]" with Lt. Manzano's findings on July 4, 2020.

**ANSWER: Admitted.**

## COUNT I

### 42 U.S.C. § 1983 – Excessive Force (Cell Extraction) in Violation of the Eighth Amendment – CO Black

113.    Plaintiff re-alleges each paragraph of this Fourth Amended Complaint as if fully stated herein.

**ANSWER: Defendants reassert each answer similarly.**

114.    In excessively and gratuitously deploying pepper spray and pepper balls to extract Plaintiff from his cell, Defendants applied force maliciously for the purpose of causing harm.

**ANSWER: Denied.**

115.    Defendants applied force that was disproportionate to any need to maintain or restore order or discipline.

**ANSWER: Denied.**

116.    While using excessive force, Defendants recognized the unnecessary nature of the force applied. For instance, Defendants significantly outnumbered

Plaintiff and were heavily armed with weapons and protective gear. Further Plaintiff did not have a weapon and did not threaten to harm Defendants.

**ANSWER: Denied.**

117.    Defendants made no effort to temper the severity of the force they applied in extracting Plaintiff from his cell.

**ANSWER: Denied.**

118.    Defendants had actual notice of Plaintiff's serious medical need for mental and physical health care following the January 23, 2020 cell extraction.

**ANSWER: Denied.**

119.    Defendants intentionally delayed Plaintiff's access to care and the ability to wash himself, and knowingly and intentionally subjected Plaintiff to days of physical suffering and mental anguish directly caused by their failure to allow Plaintiff to clean the painful pepper spray and pepper ball residue off is bruised and battered body and receive medical attention following the cell extraction.

**ANSWER: Denied.**

120.    As a result of Defendants' use of excessive force in violation of Plaintiff's constitutional rights, Plaintiff suffered physical injuries to his head, torso, and genital areas, and experienced mental anguish.

**ANSWER: Denied.**

## COUNT II

**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Need (Medication) in Violation of the Eighth Amendment – CO Porter, Nurse Emmons**

121.     Plaintiff re-alleges each paragraph of this Fourth Amended Complaint as if fully stated herein.

**ANSWER: Defendants reassert each answer similarly.**

122.     At all times relevant, Plaintiff had well-documented mental and physical needs for which prison medical personnel had prescribed psychotropic medication. Plaintiff relied on this medication to maintain his mental health and stability.

**ANSWER: Defendants admit Plaintiff was prescribed medications by a mental-health professional. Defendants lack knowledge sufficient to form a belief as to the truth of the rest.**

123.     On January 23, 2020, Plaintiff notified one or more of the Defendants that he needed his medication. On information and belief, Defendants were deliberately indifferent to Plaintiff's medical need by refusing to convey Plaintiff's request for his medications to medical staff.

**ANSWER: Denied.**

124.     The delay in receiving his medication caused Plaintiff to experience a mental health episode, resulting in the use of excessive force causing physical injury.

**ANSWER: Denied.**

125.    Defendants' deliberate indifference caused Plaintiff to suffer great mental anguish, physical and emotional pain and suffering, and other grievous injuries and damages.

**ANSWER: Denied.**

**COUNT III**

**42 U.S.C. § 1983 – Failure to Intervene in Violation of the Eighth Amendment – CO Conley, CO Papke, CO Schlossler, CO Marinelli, CO Martinez, CO Porter, Nurse Emmons**

126.    Plaintiff re-alleges each paragraph of this Fourth Amended Complaint as if fully stated herein.

**ANSWER: Defendants reassert each answer similarly.**

127.    In the manner described above, during the constitutional violations enumerated in Counts I and II, each Defendant at certain times stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity and obligation to do so.

**ANSWER: Denied.**

128.    Defendants had several reasonable opportunities over a substantial period of time to prevent this harm but failed to do so.

**ANSWER: Denied.**

129.   Failing to intervene was objectively unreasonable. Given their training and experience as IDOC employees and correctional officers, Defendants knew or should have known that Plaintiffs' constitutional rights were being violated by their co-Defendants, yet they said and did nothing to attempt to stop it.

**ANSWER: Denied.**

130.   As a result of Defendants' failure to intervene, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages.

**ANSWER: Denied.**

## DEMAND FOR JURY TRIAL

Defendants demand a trial by jury of all issues so triable.

## AFFIRMATIVE DEFENSES

1.  **Qualified Immunity**. Defendants Jordan Black, Michael Conley, Kassandra Marinelli, Danny Martinez, Luke Papke, Ben Schlosser, Katherine Emmons, and Brent Porter assert they are entitled to qualified immunity because, at all times relevant, they acted within the scope of their discretionary duties and did not violate any clearly established constitutional or statutory rights of which a reasonable official would have known. The conduct alleged— responding to reports of inmate noncompliance and perceived threats, applying force in accordance with IDOC policy, and exercising professional medical and correctional judgment—does not rise to the level of a constitutional violation under clearly established law. Accordingly, Defendants are immune from liability under the doctrine of qualified immunity.

2.  **Statute of Limitations as to Emmons, Porter**. The events giving rise to this action occurred on January 23, 2020. Plaintiff filed his original complaint on October 8, 2020, but did not seek to add Defendants Emmons and Porter

until August 25, 2023—more than three and a half years after the incident. Although Plaintiff was in possession of records identifying these individuals as participants in the incident as early as December 3, 2021, when defense counsel produced an email (Bates-stamped IDOC 000004–000006) referencing them by name in response to Plaintiff's discovery request, Plaintiff took no action to name them within the two-year statute of limitations applicable to § 1983 claims under 735 ILCS 5/13-202. The Court granted leave to amend on November 17, 2023, and Plaintiff filed his Second Amended Complaint on November 27, 2023—over 22 months past the statutory deadline of January 23, 2022. Accordingly, Plaintiff's claims against Defendants Emmons and Porter are time-barred and must be dismissed.

**3.** **Heck v. Humphrey**. Plaintiff's claims are barred in whole or in part by the doctrine established in *Heck v. Humphrey*, 512 U.S. 477 (1994), because the factual foundation of Plaintiff's Fourth Amended Complaint directly challenges the validity of disciplinary findings made against him in connection with the January 23, 2020 incident, including guilty findings for assaulting staff with an unknown liquid substance, possession of dangerous contraband, obstruction of surveillance, and disobeying direct orders—all of which resulted in, among other penalties, the revocation of two months of good conduct credit Plaintiff otherwise would have been entitled to under the Illinois Unified Code of Corrections. Accordingly, because of the disciplinary findings made against Plaintiff in connection with the incident and his conduct on January 23, 2020, Plaintiff's release from custody was extended by two months. Because a judgment in Plaintiff's favor on these claims would necessarily imply the invalidity of those disciplinary sanctions and loss-of-liberty credit, and because Plaintiff has not demonstrated that the disciplinary findings have been reversed, expunged, invalidated, or otherwise called into question through a properly exhausted state or federal proceeding, his claims are not cognizable under § 1983 in whole or in part.

Dated:  February 23, 2026

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

By:     */Daniel N. Robbin/*
        Daniel Noah Robbin
        Bar No. 6321386
        Assistant Unit Supervisor, Prisoner Litigation
        Government Representation Division
        Office of the Attorney General

115 S. La Salle St.
Chicago, Illinois 60603
(312) 814-7199
daniel.robbin@ilag.gov