## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| JEREMY WASHINGTON, | CASE No. 3:20-CV-50390 |
| PLAINTIFF, | |
| V. | HONORABLE IAIN D. JOHNSTON |
| MICHAEL CONLEY, ET AL. | |
| DEFENDANTS. | |

## MEMORANDUM OPINION AND ORDER

Jeremy Washington—an inmate within the Illinois Department of Corrections—has brought this action against eight defendant correctional staff members, alleging excessive force, deliberate indifference to a serious medical condition, and failure to intervene, stemming from a cell extraction that occurred on January 23, 2020.

Defendant Correctional Officers (COs) Jordan Black, Michael Conley, Kassandra Marinelli, Danny Martinez, Luke Papke, Benjamin Schlossler, and Brent Porter, as well as Nurse Katherine Emmons, have moved for summary judgment [227] on all claims remaining before the Court. For the following reasons, the motion is granted and the civil case is terminated.

**Undisputed Factual Background**[1]

On January 23, 2020, Jeremy Washington was housed at Dixon Correctional Center (Dixon) within the Illinois Department of Corrections (IDOC). Defendants' Statement of Material Facts (DSMF) [228] at ¶ 2. Washington suffers from mental illnesses, including antisocial personality disorder, borderline personality disorder, schizoaffective disorder, and impulse control disorder. Plaintiff's Statement of Additional Material Facts (PSAMF) [244] at ¶ 1; Psychiatric Progress Note [244-1] at 2.[2] He was prescribed medication to assist with these conditions and was housed in Dixon's Special Treatment Center, a segregation unit for mentally ill and developmentally disabled inmates. PSAMF at ¶ 2; DSMF at ¶ 2. Washington had recently been moved to Dixon from Pontiac Correctional Center (Pontiac) after assaulting a nurse at Pontiac. DSMF at ¶ 3.[3]

---

[1] Unfortunately—but unsurprisingly—the Rule 56.1 disclosures of material "undisputed" facts are riddled with disputed facts. Indeed, of Washington's 40 statements contained in his Statement of Additional Material Facts, Defendants response objects to, disputes, or recharacterizes all but seven of them. Dkt. 248. "If there is doubt about the existence of a material fact, then those doubts should be resolved in favor of the nonmoving party and summary judgment ought to be denied." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Disputing nearly every so-called "material fact" presented by a plaintiff would intuitively appear contrary to a defendant's goal of being granted summary judgment. Some of those facts Defendants have disputed probably *are* material. Only what can be described as verifiably undisputed by comparison of both disclosures, both responses, and the relevant exhibits have been included as background information.

This briefing and other recent summary judgment briefing in other cases has caused the Court to seriously question the utility of Local Rule 56.1. *See, e.g., Chaudhry v. Thorsen*, Case No. 3:20-CV-50381, 2026 U.S. Dist. LEXIS 57070 at *2 n.1 (N.D. Ill. Mar. 18, 2026); *Aska v. Yingling*, Case No. 3:23-CV-50004, 2026 U.S. Dist. LEXIS 12624 at *1-19 (N.D. Ill. Jan. 22, 2026).

[2] Defendants' objection to PSAMF ¶ 1 is overruled. The Psychiatric Progress Note at ex. 1 reflects Washington's diagnoses as being reflected "per chart." The diagnoses weren't newly made in June 2020. Unless Defendants have unpresented evidence to argue that Washington was diagnosed between January and June 2020, or *wasn't* affected by these disorders during the encounter, then Washington has met his burden to establish his mental illness during the encounter in January 2020.

[3] Washington's relevance objection to DSMF ¶ 3 is overruled. The Court uses this fact only for background on how the matter came to be.

2

During the afternoon shift on January 23, 2020, Defendant CO Porter informed Defendant Nurse Emmons that a "shit bomb" was present in Washington's cell. *Id.* at ¶ 11.[4] Moreover, Washington had covered the window into his cell and correctional staff couldn't see inside his cell. *Id.* at ¶ 17. Washington didn't receive his PM medication. PSAMF at ¶ 3.

At Dixon, cell extractions are carried out by a trained tactical team of correctional officers within the prison. Martinez dep. [228-17] at 29:5-29:13. Extractions occur only after deescalation proves ineffective and an inmate is determined by a supervisor to be a threat to themselves or others or otherwise requires removal from his cell. Schlossler dep. [228-19] at 52:1-52:8; Marinelli dep. [228-7] at 54:7-55:8. A cell extraction is only authorized by Dixon supervision, specifically by a major, after following a chain of command. Black dep. [228-10] at 96:1-96:6; Colton Love[5] dep. [228-12] at 19:1-19:8; Martinez dep. at 125:3-125:11. If necessary, force may be used during an extraction, and the tactical team has been trained specifically in use of force. Black dep. at 211:5-212:8; Marinelli dep. at 48:13-

---

[4] A "shit bomb," as it sounds, is a name used to describe a container containing human feces that's intended to be thrown at correctional staff. Emmons dep. [228-5] at 111:24-112:1; Porter dep. [228-6] at 50:14-50:19. Porter reported that he was informed by janitorial staff (general population inmates at Dixon) that Washington possessed a "shit bomb." Porter dep. at 50:25-51:3. Porter doesn't recall exactly which inmates told him this information. *Id.* at 51:4-51:5. These statements made by unknown declarant inmates are obviously hearsay and won't come into evidence for the truth of the matter asserted (i.e., that a "shit bomb" was present in Washington's cell). Fed. R. Evid. 802. A court may not consider inadmissible hearsay for its truth at summary judgment. *Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023). Porter himself did not see a "shit bomb" in Washington's cell and no "shit bomb" was ever found in Washington's cell. Porter dep. at 52:18-52:20; Use of Force Inquiry [244-4] at 6 (only a black comb was found in Washington's cell).
[5] Colton Love was a lieutenant at Dixon on January 23, 2020.

49:3. Use of force during an extraction only occurs at the tactical team leader's discretion. Schlossler dep. at 145:23-146:12.

Force available to the tactical team leader at Dixon included pepper spray and pepper balls. Martinez dep. at 93:17-93:22. Pepper spray—also known as OC spray, short for oleoresin capsicum spray—is designed to cause irritation of the eyes and nose and result in the inmate ceasing combative behavior. DSMF at ¶¶ 32-33; Black dep. at 111:1-111:18; Papke dep. [228-18] at 126:14-126:18.[6] On the other hand, pepper balls are an impact munition, shot from a device resembling a paintball gun, that contains a compact form of pepper spray. Papke dep. at 112:24-113:3; Schlossler dep. at 142:17-142:24; IDOC Administrative Directive 05.01.129 [244-7]. In using pepper balls, training dictates that they should first be used to saturate an area (i.e., releasing pepper spray into the air), but if ineffective, may be shot directly at a subject. Papke dep. at 69:1-69:13. If firing pepper balls directly at a subject, training dictates that the pepper balls should at least not be directed at an inmate's head, neck, or genitals.[7] Schlossler dep. at 144:16-145:4; PSAMF at ¶ 23. Pepper balls were a relatively new tool to the Dixon tactical team in January 2020 and were the highest

---

[6] Washington's relevance objection to DSMF ¶ 32 is overruled. The overarching purpose of pepper spray in a correctional setting is plainly relevant when the complaint alleges its excessive use. Fed. R. Evid. 401.

[7] Notably, Black did not identify the genitals as an area to be avoided when deploying pepper balls at an inmate. Black dep. at 117:23-118:2. But Marinelli, Martinez, Papke, and Schlossler each reported that the genitals or groin should be avoided when deploying pepper balls at an inmate. Marinelli dep. at 71:11-71:14; Martinez dep. at 90:11-90:14; Papke dep. at 68:18-68:24; Schlossler dep. at 144:16-145:4. Furthermore, PSAMF ¶ 23—identifying the genitals as an area that officers are trained not to aim at—is undisputed. Defendants' Response to PSAMF [248] at ¶ 23.

4

form of nonlethal force available at Dixon. Papke dep. at 109:8-109:11; Marinelli dep. at 135:16-135:18.

Following a cell extraction, inmates are strip searched. Martinez dep. at 37:6-37:8. Strip searches may be compliant searches, where inmates remove their own clothing under supervision, or non-compliant searches, where correctional staff place inmates on a bed and strip them of their clothing. Marinelli dep. at 61:4-62:1. Strip searches following an extraction where force was used are always non-compliant searches. Martinez dep. at 39:4-39:9. Medical attention is also provided after any use of force. Schlossler dep. at 148:15-148:16.

By 10:50pm on January 23, 2020, after Washington declined to remove the covering from his cell window, the decision was made by Dixon leadership to extract Washington from his cell. DSMF at ¶¶ 18-19. Six tactical IDOC officers—Defendant COs Black, Conley, Schlossler, Martinez, Papke, and Marinelli—were assigned with extracting Washington from his cell. *Id.* at ¶¶ 21, 22. The extraction was audio and video recorded. Extraction Video [228-4]. Black was the tactical team leader, tasked with administering force including pepper spray and pepper balls. DSMF at ¶¶ 22-23.

By 11:10pm, the operation to extract Washington began. *Id.* at ¶ 25. When officers approached Washington's cell and opened its chuckhole, Washington threw an unknown liquid at the cell door. *Id.* at ¶ 37; Extraction Video at 0:45-0:53. Black then ordered Washington to submit to restraints ("cuff up") three times, but Washington refused. *Id.* at ¶ 25; Extraction Video at 0:54-1:14. Over the next seven

to eight minutes, Black deployed five bursts of pepper spray lasting a total of 24-26 seconds into Washington's cell—in bursts between one and nine seconds—and also fired approximately 34 pepper balls into the cell, in bursts between two to six shots.[8] DSMF at ¶¶ 30-31; Washington's Response to DSMF [245] at ¶ 30; PSAMF [244] at ¶ 16; Extraction Video at 1:38-8:22. All the while, Black ordered Washington a total of twenty times to "cuff up." DSMF at ¶ 28; Extraction Video at 0:06-8:18.[9] Washington continued to refuse, instead pacing in his cell with a cloth covering his face and while holding an unknown item in his hand, later identified as a comb. *Id.* at ¶¶ 26, 38-39; Use of Force Inquiry [228-4] at 6.

After this force was used, Washington finally signaled an intent to submit to restraints and placed his hands through the chuckhole with his back to the door, at which time force ceased. DSMF at ¶¶ 40-41; Extraction Video at 8:16-8:35. The tactical team secured Washington's hands behind his back, then opened the cell door and escorted him to the ground. *Id.* at ¶ 42; Extraction Video at 8:50-9:56.

---

[8] The video is taken from outside of the cell, looking down onto the chuckhole from where the pepper spray was deployed and from where most of the pepper balls were fired. However, the video does not capture where in Washington's cell—and/or where on Washington's body—the pepper ball shots were making contact. Because of the narrow opening and vantage point provided by the chuckhole, only Black and Washington would know where each pepper ball was landing.

[9] The Court is unsure what to make of Washington's conclusory response disputing the validity and actionability of the orders to "cuff up." Washington's Response to DSMF at ¶ 28. Inmates are unable to disobey orders—even those that they perceive to be unjust or illegitimate—because doing so could have serious adverse consequences for institutional efforts to maintain order and avoid disturbances. *Tigert v. Higgins*, 290 F. App'x 93, 101 (10th Cir. 2008); *see also Johnson v. Davis*, Civ. No. 3:23-cv-762, 2025 U.S. Dist. LEXIS 6708 at *14 (M.D. Pa. Jan. 14, 2025) ("While [Defendant] may have subjectively deemed the orders to be invalid, this subjective belief does not provide the prisoner-plaintiff a license to ignore the orders and then sue correctional staff…").

Washington had his face covering removed by officers and replaced with a spit mask, was further secured at his ankles, and was then escorted to an eyewash station, where he was permitted to rinse his eyes out with water. DSMF at ¶ 44; Extraction Video at 10:00-13:03. The front of Washington's shorts were coated in orange residue. PSAMF at ¶ 21. Following the eyewash, he was taken to a location where Defendant Nurse Emmons could conduct a medical assessment. DSMF at ¶ 46; Extraction Video at 13:04-13:40.

Emmons asked Washington where he was struck (by pepper balls) and he responded, "I'm good, I'm good." Extraction Video at 13:49-13:51. After Emmons and correctional staff sought clarity with Washington whether he's refusing treatment, Washington reported that he was hit in his genitals and requested medical attention. *Id.* at 13:54-14:08 (Washington: "I got hit in my balls and my dick" Staff: "Do you want medical attention?" Washington: "Yeah"). Emmons proceeded to examine Washington's back and chest after the tactical team lifted his shirt. *Id.* at 14:31-14:55. *Id.* Emmons also pulled Washington's shorts down slightly at the hip and examined his outer thigh, but not his genitals. *Id.* at 14:55-15:01. Washington's stomach had white residue on it, but his back had no noticeable marks or residue. *Id.* at 15:01-15:20. Washington's face revealed no marks or residue. *Id.* at 15:30-15:41.

Staff then asked Emmons if she was done with her evaluation and Washington asked to see the warden, stating "my balls and my dick hurt." *Id.* at 15:47-15:51. Emmons requested for Washington to be stood up so she could evaluate his genitals; Washington asked "why?" and stated that he just needed water. *Id.* at 15:51-16:02.

Washington was then escorted to a new cell. *Id.* at 16:03-17:29. During transport, Washington told officers he was going to sue them and stated that he is suicidal and homicidal. *Id.* at 17:23-17:24, 18:14-18:16. He was assisted onto the bed in the new cell and a non-compliant strip search was conducted with the camera directed at a cell wall. *Id.* at 18:55-19:10; 19:30-26:24. The individual conducting the search verbally announced his search to the camera as he conducted it. *Id.*

After the search was conducted, but with the camera still paned to the cell wall, Washington made a statement to the officers about an officer having touched his buttocks, saying "somebody did touch my ass." *Id.* at 27:50-27:57. Officers directed Washington to focus on changing his clothing. *Id.* at 27:58. The camera returned to Washington only once he was dressed in an anti-suicide smock. *Id.* at 30:40. Washington had a conversation with officers during this time, but many of his words were unintelligible through the spit mask. *Id.* at 30:40-33:25. Washington told officers that his shoulder was in pain and they assisted him in rolling onto his stomach to alleviate the pain. *Id.* at 33:25-34:01. A mattress was placed on the bed. *Id.* at 37:54-38:40. The video ended as the officers left Washington's new cell. *Id.* at 43:35-44:57. At no point in the video did Washington receive his medication. PSAMF at ¶ 27.

Washington was ultimately subject to administrative discipline in the prison for his conduct on January 23, 2020, specifically charging him with assault for throwing the unknown liquid at the tactical team, as well as disobeying direct orders and possession of dangerous contraband, for the comb. DSMF at ¶ 59. He was found

guilty by the Adjustment Committee and as a result lost two months of good conduct credit. *Id.*

**Relevant Procedural Background**

Washington wrote three grievances regarding the cell extraction, each unsuccessful. *Id.* at ¶¶ 28-29. Thereafter, he brought this action *pro se* on October 8, 2020. DSMF at ¶ 60. Neither Defendant CO Porter nor Nurse Emmons were named in that complaint. *Id.* at ¶ 63. In August 2021, the Court recruited counsel for Washington. *Id.* at ¶ 64.[10] Then in September 2021, a Case Management Order set an April 29, 2022 deadline for adding new counts or parties. *Id.* at ¶ 65; dkt. 55. Fact discovery ensued over the subsequent months, including documentary evidence of at least some of Porter and Emmons' involvement in Washington's care that night. DSMF at ¶¶ 66-79.

Over the course of late 2022, Washington and Defendants exchanged correspondence related to outstanding discovery, with Washington claiming Defendants had not disclosed all material documents. PSAMF at ¶¶ 34, 36-37. Documentary discovery was not formally completed until January 2023. *Id.* at ¶ 37.[11] Washington purports to have learned for the first time in April 2023 that Porter and Emmons were those who had allegedly wrongfully withheld his medication. *Id.* at ¶

---

[10] The Court thanks recruited counsel for their more-than-diligent representation of Washington in this action. Hopefully, Washington understands that he received excellent legal representation free of charge.
[11] Defendants' materiality objection to PSAMF ¶ 37 is overruled.

39.[12] In August 2023, Washington moved to file a second amended complaint naming Defendants Porter and Emmons and this motion was granted by the Court. *Id.* at ¶ 40; dkts. 99, 107.

**Analysis**

Defendants have moved to dismiss each count against all defendants. They seek dismissal of Count I (Excessive Force) against Defendant Black, arguing that Black's use of force didn't violate the Eighth Amendment as a matter of law. They seek dismissal of Count II (Deliberate Indifference) against Defendants Porter and Emmons, arguing that Washington didn't suffer from a serious medical condition and that Porter and Emmons weren't deliberately indifferent as a matter of law. They seek dismissal of Count III (Failure to Intervene) against all remaining Defendants, arguing that the lack of an underlying constitutional claim prevents a failure to intervene claim as a matter of law. Additionally, Defendants seek dismissal of Counts II and III against Porter and Emmons on procedural grounds, arguing that the claims are time-barred. And finally, Defendants argue that they are entitled to qualified immunity on all claims.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant, construing the evidence and all

---

[12] Defendants' objection to PSAMF ¶ 39 is overruled; however, it is noted that Defendants dispute that this was the first Washington would have learned that medical staff such as Emmons were responsible for medication distribution, or that Porter had drafted the incident report regarding the "shit bomb."

reasonable inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). The Court need not draw every conceivable inference in favor of the nonmovant, only reasonable ones. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005).

### i.     Count I: Excessive Force & Count III: Failure to Intervene

The Eighth Amendment prohibits the use of cruel and unusual punishment. U.S. Const. amend. VIII; *Graham v. Connor*, 490 U.S. 386, 394 (1989). But not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "After incarceration, only the 'unnecessary and wanton infliction of pain' … constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.* (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). This includes punishment that is "so totally without penological justification that it results in the gratuitous infliction of suffering." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

When a prison security measure is taken to resolve a disturbance, the question of whether the measure inflicted "unnecessary and wanton pain and suffering" ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline[,] or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Factors include the need for the application of force, the relationship

11

between the need for force and the amount of force that was used, [and] the extent of injury inflicted. *Whitley*, 475 U.S. at 321. But a lack of serious injury doesn't end the inquiry, and both the threat "reasonably perceived by the responsible officials" and "any efforts made to temper the severity of a forceful response" are also relevant. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

*        *        *

Here, a disputed fact exists as to whether Black, in firing pepper balls at Washington, deliberately fired them in a manner to intentionally strike Washington's genitals. *Compare* PSAMF at ¶ 19 *with* Defendants' Response to PSAMF [248] at ¶ 19; *and compare* Black dep. at 117:15-117:18 (Black admits to aiming "anywhere except the head, neck, and spine") *with* Washington dep. [228-1] at 53:5-53:10 ("All… the pepper balls were shot at my body. Body, penis, and all that."); *and id.* at 58:19-58:21 ("[W]hoever was shooting the pepper ball gun was shooting directly at my penis."); *see also* PSAMF at ¶ 21 (the front of Washington's shorts were coated in orange residue); *and see above* at fn.7. Notwithstanding the fact that Washington was unrestrained during the use of force and could have presumably turned his body away from the chuckhole to avoid many of the pepper balls from contacting his genitals, this kind of dispute could ordinarily preclude summary judgment.

But taking this disputed fact in favor of Washington as the nonmoving party, *even if* Black did intentionally fire pepper balls at Washington's genitals, it was not done to "inflict[] unnecessary and wanton pain and suffering" as a matter of law. *Whitley*, 475 U.S. at 320. Rather, it was done in a good faith concerted effort to extract

12

Washington from his cell and restore order in the prison setting. *Id.* at 320-21. So, the motion for summary judgment must be granted for Count I.

Washington admits to covering his cell window and throwing an unknown liquid at correctional officers before force was ever initiated. Throughout the encounter with correctional officers, Washington held an unknown item in his hand, fairly identified by officers as a threat. After removal, Washington admitted to being suicidal and homicidal. All told, there was a legitimate penological need for Washington to be removed from his cell. Over the course of that necessary extraction, Washington was told *twenty times* to submit to restraints. He *continuously* refused. Force was never applied in a rapid-fire volley to gratuitously inflict pain (i.e., 34 rounds at once), but instead in several short bursts, in between additional attempts at gaining compliance verbally. When Washington finally submitted to restraints, all use of force stopped. This is all indicative of good faith effort on the part of Black to gain Washington's compliance with his extraction, not wanton infliction of unnecessary pain and suffering.

The *Whitley* and *Hudson* factors support this conclusion. There was a clear need for some application of force, as Washington had assaulted staff with an unknown liquid and was refusing to submit to restraints while holding an unknown item in his hand. The amount of force used was reasonable under the circumstances and didn't exceed a short volley of six pepper balls at one time, interjected with verbal orders to submit to restraints. The injury suffered by Washington was minimal, as despite his expressed discomfort in his genitals, he declined immediate treatment for

13

his injuries and instead preferred to discuss the matter with the warden.[13] There was a significant threat reasonably perceived by the correctional officers in an inmate who had thrown something at officers, had been reported to be in possession of feces to be thrown at officers, and was holding an unknown object. And again, there were "efforts made to temper the severity of a forceful response" in the tactical team's repeated attempts to gain compliance verbally. *Whitley*, 475 U.S. at 320-21; *Hudson* 503 U.S. at 7.

To Washington's point regarding his mental health, it's possible that notwithstanding Defendant Porter's apparently erroneous report that Washington possessed a "shit bomb," Washington may have received his medications and the need for extraction—and its accompanying force—would never have come to be. It doesn't follow though that Washington was then *not* in need of extraction when he covered his cell window and subsequently threw something at the tactical team upon their attempts to gain compliance verbally. Likewise, it doesn't follow that an alleged mistake (or even alleged fraud) by Defendant Porter makes Defendant Black's force any more or less objectively reasonable under the circumstances. Put another way, even inmates who are experiencing vivid hallucinations and delusions—or believe Jeffrey Dahmer is in their cell, as Washington stated in his deposition—may require extraction from their cells if they cover their cell window and throw substances at staff. When these extractions occur in good faith efforts to restore order and without

---

[13] There is also nothing in the record to reflect that Washington suffered any long-term injury because of Black's use of force.

14

inflicting unnecessary and wanton pain and suffering, they don't run afoul of the Eighth Amendment.

Although new, the use of pepper ball projectiles was approved by the IDOC as less-than-lethal force. Washington's extraction was approved by Dixon leadership. Black's use of force stopped when Washington submitted to restraints. As a matter of law, Black's conduct was not done to "inflict[] unnecessary and wanton pain and suffering," but instead was done to extract Washington from his cell and restore order in the prison. Black's force was not unconstitutional as a matter of law.

Regarding Count III, officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's constitutional right by use of excessive force, but fail to do so, may be held liable. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (quoting *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000)). But for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation. *Harper*, 400 F.3d 1052 at 1064. The failure to establish Black's excessive force requires granting of summary judgment on the failure to intervene claim against all Defendants.[14]

---

[14] Even if Black's conduct were left to a jury, summary judgment for Defendants would be appropriate on Count III. Failure to intervene in this context would require Defendants *know* that a fellow officer is violating a prisoner's rights. *Stewardson v. Titus*, 126 F.4th 1264, 1279 (7th Cir. 2025) ("The law does not require officers to act as fortune tellers…"). Black's mere use of the pepper ball gun—across an eight-minute period and interjected with numerous verbal commands to "cuff up"—is clearly not excessive force. Given the narrow opening of the chuckhole, Black is the only officer who would know if he were intentionally striking Washington in the genitals with the pepper ball gun.

15

*ii.    Count II: Deliberate Indifference*

The Eighth Amendment's prohibition on the use of cruel and unusual punishment extends to safeguarding prisoners against a lack of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." U.S. Const. amend. VIII; *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009); *Estelle*, 429 U.S. at 103). A claim based on deficient medical care must demonstrate two elements: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition. *Arnett*, 658 F.3d at 750. "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Id.* (quoting *Rodriguez*, 577 F.3d at 828; *Estelle*, 429 U.S. at 103).

Deliberate indifference is a subjective standard and requires a showing that the defendant "acted with a sufficiently culpable state of mind," akin to recklessness. *Arnett*, 658 F.3d at 751. "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Id.* (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). "A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that 'no minimally competent professional would

16

have so responded under those circumstances.'" *Arnett*, 658 F.3d at 751 (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)).

*   *   *

Washington cabins his response to only the missed medication and abandons any deliberate indifference claim related to post-extraction medical care. Washington's Memorandum Opposing Motion [243] at 10-14. But a reasonable jury couldn't find that either Porter or Emmons were deliberately indifferent to Washington's medical conditions. Because the Court finds that Emmons and Porter weren't deliberately indifferent to Washington's medical conditions, it doesn't reach the question of whether Washington suffered from a serious medical condition or if it was exasperated by the missed medication.

It's undisputed that Porter completed a report detailing his being told of the presence of a "shit bomb" in Washington's cell, and that he then told Defendant Nurse Emmons of this report. DSMF at ¶¶ 7, 11; Washington's Response to DSMF at ¶¶ 7, 11. The statement or statements from inmate custodians are inadmissible hearsay for the truth of the matter they assert—i.e., that Washington actually possessed a "shit bomb." And taking disputed facts in a light most favorable to Washington for the purpose of this motion, there was never a "shit bomb" present in his cell. *See above* at fn.4.

But these statements are admissible for another purpose. Most prominently, the inmate-declarant statements to Porter (that Washington possessed a "shit bomb") may be considered by the Court for the effect the statements had on Porter as the

17

listener. *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019). The "effect on a listener" avenue around the rule against hearsay applies only if the listener both heard and reacted to the statement and if the actual use of the statement is to demonstrate the listener's response. *United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022) (citing *United States v. Gaytan*, 649 F.3d 573, 579-80 (7th Cir. 2011); *Jones v. Basinger*, 635 F.3d 1030, 1042 n.2 (7th Cir. 2011) (internal quotations omitted)).

Here, this clearly applies. Porter heard the statement from an inmate custodian. Porter dep. at 65:15-65:18. In response, he both authored an incident report and informed his superiors. Porter dep. at 50:10-50:13. The Court uses the inmate custodian statements only for its effect on Porter and not for its truth.[15] So, the Court can consider that Porter believed there was a "shit bomb" in Washington's cell, even though there wasn't.[16] Emmons—having been told directly by Porter of the situation—also believed there was a "shit bomb" in Washington's cell. Emmons dep. at 111:20-111:23.

Given this belief, it can't be said that either Porter or Emmons were *indifferent* to Washington's medical needs in declining to open his chuckhole and provide him with his medication. Rather, they were merely acting wisely and cautiously in their approach to Washington's cell. Correctional staff taking a cautious approach in

---

[15] Whether a jury would be capable of making this distinction—accepting the statement for its effect on Porter but not its truth—is a different question, and not one the Court must answer. *See Graham*, 47 F.4th at 567-68. The Court is plenty capable of making this distinction for the purpose of summary judgment.

[16] It's also worth mention that this belief was not completely unfounded. Washington threw something—even if not a "shit bomb" *per se*—at the tactical team upon their approach to his cell. It's hard to square this with Washington's claim that the "shit bomb" report was "clearly false and pretextual." Washington's Memorandum Opposing Motion at 12.

18

dispensing medication to a volatile prisoner is not deliberate indifference; it's just being aware of one's surroundings.

Distinguishing this matter from that cited by Washington, the undisputed record belies the assertion that correctional staff "refused" to administer medication. *See Board v. Farnham*, 394 F.3d 469, 485 (7th Cir. 2005). In *Farnham*, correctional staff deprived an inmate of toothpaste for three weeks, while also depriving him of his asthma inhaler on multiple occasions. *Id.* at 480-81, 484-85. That's a far cry from a single missed medication due to legitimate staff safety concerns. And a lack of memory on the part of deponents testifying over five years after the events in question about a single medication dispensing window doesn't make a reasonable jury any more capable of finding them deliberately indifferent.

Finally, to the extent that the degree of Defendants' animus against Washington remains a disputed fact, taking the facts in favor of Washington, a reasonable jury still couldn't find that there was deliberate indifference within a single missed medication. The evidence pointed to by Washington, such as refusals to move about the facility, are both unrelated to either Porter and Emmons—only Black was alleged to be refusing Washington showers—and instead is much more closely related to Washington's status as "tactical move only." DSMF at ¶¶ 4-5; Extraction Video at 0:07. Moreover, any text message evidence between Defendants—though again not implicating Porter or Emmons—occurred over a year after the extraction and ostensibly had to do with Washington's then-pending litigation; not his status or treatment in the prison. PSAMF at ¶ 9; PSAMF ex. 4.

19

To find deliberate indifference as a matter of law, a reasonable jury must be able to find that "no minimally competent professional would have so responded under those circumstances." *Arnett*, 658 F.3d at 751 (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). To the contrary, *every* minimally competent professional would have responded just as Emmons did.

### iii. Defendants Are Entitled to Qualified Immunity

Public officials are entitled to qualified immunity unless a plaintiff can show that they violated clearly established law by either identifying closely analogous controlling case law with similar facts—not as a general proposition—or by showing that the action obviously violated the Constitution, which is rare. *Nielsen v. Sexton*, 168 F.4th 968, 993 (7th Cir. 2026). Washington has failed on both grounds. And his reliance on district court cases is unavailing as they don't clearly establish the law under qualified immunity. *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995). More than forty years ago, the Seventh Circuit stated, "[t]he use of … chemical agent … when reasonably necessary … to subdue recalcitrant prisoners does not constitute cruel and inhuman punishment." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). Indeed, the facts of this case are perfectly aligned with the recognition that "[c]ustodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority ... is to be managed." *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012).

20

Defendants are entitled to qualified immunity as to the excessive force claim and its derivative failure to intervene claim. And for the same reasons, they are entitled to qualified immunity as to the deliberate indifference claim.

**Conclusion**

Because the Court finds no constitutional violations, Defendants are entitled to summary judgment. And even if there could somehow possibly be a constitutional violation under these facts, they would be entitled to qualified immunity. So, there is no need for an evaluation of whether any claims were time-barred. *Smith v. United States*, 688 F.2d 476, 477 n.1 (7th Cir. 1982). Summary judgment is granted to Defendants on all claims and the civil case is terminated.

Date: May 15, 2026                    By:     _____

                                              Iain D. Johnston
                                              United States District Judge